Caleb E. Mason (State Bar No. 246653)
Jacqueline M. Sparagna (State Bar No. 315275)
WERKSMAN JACKSON & QUINN LLP
888 West Sixth Street, Fourth Floor
Los Angeles, California 90017
(213) 688-0460
cmason@werksmanjackson.com
Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## CENTRAL  DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFREY TOLAND,<br><br>   Plaintiff,<br><br>v.<br><br>ZACHARY MCFARLAND, in his individual and official capacity; STEPHANIE LACK, in her individual and official capacity; PASADENA CITY ATTORNEY'S OFFICE; JOHN NAM, in his individual and official capacity; and DOES 1-10, inclusive,<br><br>   Defendants. | **COMPLAINT FOR:**<br><br>**1. Deprivation of Civil Rights in Violation of 42 U.S.C. § 1983 (Excessive Force)**<br><br>**2. Deprivation of Civil Rights in Violation of 42 U.S.C. § 1983 (Unreasonable Seizure—Procurement of Arrest by False Statements)**<br><br>**3. Deprivation of Civil Rights in Violation of 42 U.S.C. § 1983—Detention Without Reasonable Suspicion**<br><br>**4. Deprivation of Civil Rights in Violation of 42 U.S.C. § 1983—Deliberate Fabrication of Evidence**<br><br>**5. Deprivation of Civil Rights in Violation Of 42 U.S.C. § 1983—Suppression of Exculpatory Evidence**<br><br>**6. Conspiracy to Engage in Deprivation of Civil Rights in Violation Of 42 U.S.C. § 1983—Suppression of Exculpatory Evidence**<br><br>**7. Injunctive Relief**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

Plaintiff Jeffrey Toland ("Mr. Toland") alleges as follows:

## INTRODUCTION

1.  This case is about a nightmare: An ordinary man home with his young daughter is stopped for an alleged traffic violation. The police officer who stopped him has a long history of violence—including lethal violence—against the community he's supposed to serve. The officer is confrontational and aggressive with the man. The man tries to placate the officer, expressing his respect for law enforcement.  But the officer is out to satisfy his desire to put his hands on someone. He pulls the man out of the car, punches him in the face repeatedly, knocks him to the ground,, Tases him, and begins choking him into unconsciousness. All of this in the man's driveway, in front of his family, who are forced to watch helplessly.

2.  This really happened to Plaintiff Jeffrey Toland.  But the nightmare did not stop there. After being beaten up, Mr. Toland was then arrested and charged with assaulting the police officer who had just punched, Tased, and choked him.   And the Pasadena City Attorney's Office—knowing that this officer was a problem, and worried about facing a civil-rights lawsuit, deliberately interfered in the case to hide exculpatory evidence. The City Attorney's told the Police Department not to investigate the incident internally or write any reports about it, and not to disclose the officer's history to the DA, the defense, or the Court.

3.  This nightmare scenario should be the stuff of  film noir. But it did happen, to Jeffrey Toland, right here in Pasadena, California.

### The Night of June 22, 2019: Mr. Toland is Beaten and Choked

4.  In the two years prior to June 22, 2019, Pasadena Police Officer Zachary McFarland had beaten, punched and Tased at least six other people while working in the Alhambra Police Department. These uses of force revealed an officer

worryingly eager to hit people—he punched a handcuffed man lying on the ground; he punched a mentally disturbed woman who had wandered into traffic; he Tased a teenage girl.  And only a month before, in Pasadena, he had shot and killed a mentally ill man. He killed the man from across the street, behind a telephone pole, while his sergeant was telling him to de-escalate. The sergeant told him to keep talking to the man.  But Officer McFarland didn't want to—he wanted to shoot.  His body-camera captured him saying under his breath, when the sergeant told him to keep talking,  "I'm going to take him out." And then he did. Officer McFarland does not have the appropriate character to carry a badge and gun. He should never have been out on the streets on the night of June 22, 2019.

5.   But he was, and he was looking for an excuse to put his hands on someone.

6.   The ordinary American in this case is Plaintiff Jeffrey Toland, who was travelling home with his daughter in the car. The officer, Pasadena Police Officer Zachary McFarland, pulled Mr. Toland over for—so he said—a malfunctioning brake light.  (In fact, Officer McFarland's dash-cam footage showed Mr. Toland's brake lights were working perfectly.) Within three minutes, Officer McFarland, angered because Mr. Toland asked him what he had been pulled over for (and he had to ask three times before Officer McFarland came up with his false answer about the brake lights),  had pulled Mr. Toland from his car, punched him a dozen times in the face and head, knocked him to the ground. McFarland then Tased him, and grabbed him around the neck and tried to choke him into unconsciousness.  A second officer, Stephanie Lack, stood by and watched the beating. She then joined in, choking Mr. Toland herself. The incident occurred in Mr. Toland's driveway, as Mr. Toland's family watched in horror.

**The Officers Lie to Cover Up the Beating**

7.   The two officers then both lied about what had happened. They falsely accused Mr. Toland of violently attacking them, and they created false reports making that accusation. Based on that false accusation, the District Attorney's Office charged Mr. Toland with assaulting a police officer, a serious violent felony charge.   But, when under oath on the witness stand at the preliminary hearing, Officer Lack admitted that in fact her report was false, She contradicted Officer McFarland's testimony (he claimed Mr. Toland had knocked him to the ground; Officer Lack testified that Officer McFarland was never on the ground at all), and she admitted that Mr. Toland didn't attack anyone or do anything violent at all.

**The Pasadena City Attorney Obstructs Justice**

8.   It is a bad thing when police officers use excessive force and lie about it. But this story gets worse.

9.   The Pasadena City Attorney's Office[1]—which should not have had any involvement in a criminal case being prosecuted by the District Attorney's Office—was closely monitoring the case and was worried about the City's potential civil liability for Officer McFarland's actions.

10. The City Attorney's Office was worried about the following facts:

▪   First, the Office knew that Officer Lack had testified under oath at the preliminary hearing that her written report was false (and that in fact Mr. Toland had not done anything violent); that she had directly contradicted Officer McFarland's claim, under oath, that Mr. Toland had attacked him and knocked him to the ground; and that clearly established law establishes that applying a chokehold (which she testified that she and Officer

---

[1] The City Attorney's Office is referred to herein as "City Attorney's Office," "City Attorney," "Office," and "City."

McFarland had done to Mr. Toland) based on Mr. Toland's "passive resistance" (sitting still on his driveway and not obeying their command to lie down, but not touching anyone or doing anything violent) is illegal excessive force as a matter of law. The City Attorney knew that if the Department prepared a use-of-force report about the Toland incident, the City would have to address that testimony.

▪ Second, the Office knew that Officer McFarland (who was still a probationary officer with Pasadena) had had six prior serious and legally questionable uses of force in his previous year working in the Alhambra Police Department. They understood the liability they potentially faced for the violent actions of an officer who should never have been given a gun and a badge.

▪ Third, and most shocking of all, the Office knew that on May 17, 2019, just *four weeks* before he beat Mr. Toland, Officer McFarland had, in highly suspect circumstances, *shot and killed* another Pasadena citizen, a mentally ill man named Daniel Warren. They knew that the Department did not place Officer McFarland on leave or do an internal investigation of the shooting. They knew that that could be a problem for the City now that Officer McFarland had beaten another person only a month later. It is standard practice to place an officer on leave and investigate when he kills a civilian. That should have happened here. It didn't. And the City Attorney's Office wanted to make sure that Mr. Toland's defense never found that out.

11. So the City Attorney's Office told the Police Department not to do an investigation or create an internal report on the Toland incident, not to put anything in writing for two years ( his time to file a civil rights suit would have expired) and not to tell the District Attorney's Office that McFarland had been the shooter in the Warren case. It was a blatant and illegal attempt to deprive Mr. Toland of his due

process rights and to procure a wrongful conviction of Mr. Toland. This was done expressly to prevent Mr. Toland from filing a civil rights lawsuit against the City. The City Attorney hoped that if they could hide Officer McFarland's history from the DA and the defense, the DA could obtain a conviction against Mr. Toland, which would undermine his civil suit.

12. The City Attorney's Office was desperate to prevent Mr. Toland's defense from finding out that McFarland had been the shooter in the Warren case. The Warren shooting was problematic, to say the least, and cast serious doubt on Officer McFarland's credibility and his fitness to carry a gun and a badge.

**May 2019: Officer McFarland Kills Daniel Warren**

13. Daniel Warren suffered from mental illness. On May 17, 2019, he was standing on the sidewalk, holding a pistol and shouting incoherently. Neighbors called 911 and multiple officers responded. When officers arrived, no one was near Mr. Warren. He was standing there shouting incoherently. Officer McFarland and four other officers took positions at least one hundred feet away, across the street and at the end of the block, behind a hedge, a wall, and a telephone pole. Video taken at the scene raises the distinct possibility that Mr. Warren may not have even been aware that the police had arrived.

*Figure 1: Officer McFarland and other officers at the Warren Shooting*

14.  Body-worn cameras recorded Officer McFarland saying that Mr. Warren was pointing his gun at the officers.  None of the other officers at the scene made any such statements at the time, though they were all standing next to each other and all looking at Mr. Warren.  The senior officer on scene instructed the officers to "keep giving him commands," and talk to him to try to de-escalate the situation. Officer McFarland, though, is palpably eager to kill.  He can be heard on his body-worn camera responding under his breath to the sergeant's "Keep talking" directive as follows: "I'm going to take him out." McFarland then takes careful aim with his rifle and shoots Mr. Warren from a hundred feet away, from behind a telephone pole.

15. The Police Department apparently had concerns about the legality of the shooting. because it asked the Sheriff's Department to investigate. The Sheriff's Department interviewed Officer McFarland who lied about how many shots he'd fired (he said one, two, or three—but eight cartridges were missing from his magazine). He claimed that Mr. Warren had clearly pointed the pistol at him twice, but review of the body-worn footage shows that none of the other officers, who were all looking at the exact same scene, ever gave any indication that they saw Mr. Warren pointing the gun at them.[2] In fact, review of the footage suggests that the man may not even have seen them—he was a block away, on the other side of the street, was mentally ill, and was yelling randomly and pacing back and forth.

16. Review of those videos shows that the other officers remained calm as a supervisor instructed them to de-escalate. "Keep giving him commands," he said. But Officer McFarland ignored that directive. He wanted to shoot. "I'm going to take him out, " he says under his breath. Then he fires, killing Daniel Warren.

---

[2] One of the officers next to Officer McFarland told the Sheriff's investigator *after the fact* that he had seen Mr. Warren pointing the pistol at officers; but that statement is belied by the officer's own actions and statement *at the time*. At the time, Officer McFarland is the only officer who ever said he saw Mr. Warren pointing the pistol. Indeed, at the time, at least one other officer responded to Officer McFarland by stating that Mr. Warren was *not* pointing the pistol at the officers. As a matter of law, as well as common sense, what a person says *at the time* is better evidence of what he actually saw than what he says *later*— particularly when he *later* has a strong incentive to tell investigators that the shooting was justified. There is a strong circumstantial inference that—just as in the Toland case—other officers were willing to make post-incident statements to cover for Officer McFarland's use of violence that are not consistent with their contemporaneous observations. And the Sheriff's investigator never questioned the officers about the conflict between their statements after the fact and the body-worn footage.

**The City Attorney's "McFarland Problem" and *Brady* Evidence Related to the Warren Killing**

17.The City Attorney's Office was worried about the City's civil liability for Officer McFarland's conduct.  Officer McFarland was obviously unfit for the job. And the City Attorney knew, among other things, that some of the statements the City had given to the news media the day of the shooting—stating that Mr. Warren had been holding an AR-15 assault rifle, had pointed it at officers, and that he had shot at officers, who had only returned fire "in an exchange of gunfire"—were out-and-out false.[3]

18.  The City knew that Mr. Warren hadn't been holding an AR-15, and hadn't shot at the officers, and that the officers hadn't "returned fire."  The City knew that Officer McFarland had opened fire, from a hundred feet away, across the street, and behind a telephone pole, killing Mr. Warren.  The City knew that the other officers on scene—who were, as the photo above shows, right next to Officer McFarland—did not perceive a threat requiring deadly force. In fact, they didn't fire their weapons until after Officer McFarland did.  The City knew that the body-cam footage showed Officer McFarland saying, before he begins shooting, "I'm going to take him out," and sounding very eager to do it. The body-cam footage shows that none of the other officers on scene *ever* claimed, during the incident, to see Mr. Warren pointing a gun at them.  Officer McFarland was the *only* one who

---

[3] See, e.g., https://abc7.com/pasadena-officer-involved-shooting/5517501/ (citing "police" for the above assertions.  The claims that Mr. Warren pointed an AR-15 at officers, or that there was an "exchange" of gunfire between Mr. Warren and the officers who shot him, are false. The AR-15 was found on the ground behind the house.  When Officer McFarland shot Mr. Warren, Mr. Warren, Mr. Warren was standing on the sidewalk in front of the house, and he had a pistol in his hand. Nor did Mr. Warren ever fire at officers. The only gunshot from Mr. Warren's pistol occurred behind the house, out of sight of the officers, after they had shot him, and while he was slumped in a chair bleeding to death.

said so at the time, despite the fact that there were at least three other officers looking at Mr. Warren.

19.  And the City knew that Officer McFarland had told investigators that he'd only shot twice, but when they looked at his gun, eight cartridges had been fired.

20.  Yet after the Warren shooting, for unknown reasons, the Department did not place Officer McFarland on leave and did not conduct an investigation.  The Department simply left him on patrol.  Failing to do an internal investigation of a fatal shooting, and failing to place the officer on leave during the investigation, run counter to widely accepted best practices.  But it didn't happen. And then, a month later, Officer McFarland beat up Mr. Toland.  And Mr. Toland asserted his innocence and hired a prominent firm to defend him.  And that worried the City Attorney's Office.

21.  Now the City Attorney's Office knew that they had two problems and Officer McFarland's actions were at the center of both.

22. And the City Attorney knew that the Police Department, if not prevented, might do its constitutional duty and provide the District Attorney with Officer McFarland's history.  So the City Attorney intervened to stop that from happening.

23. The City Attorney knew that if it came to light that this was the same officer—a probationary officer with a history of violence, who had shot one citizen and beaten up another in the course of a month, and then had (implausibly) claimed in each case that he was attacked and in fear for his life—the City could face significant legal liability on both cases.

24. The City Attorney was also worried that the media would ask how it was that this man given a gun and a badge?  Did no one vet him before hiring him? Didn't they read the news? Weren't they aware of the nationwide calls for police reform to avoid just this kind of behavior? The City did not want to answer those questions.

25.  So the City Attorney made a decision: bury it. Make sure that no one was ever able to connect the dots between the Warren case and the Toland case.  Make sure that Mr. Toland's defense never found out that Officer McFarland had been the shooter in the Warren killing.

26.  The Police Department had released footage of the Warren shooting—but had not mentioned Officer McFarland's name or identified him as the shooter. Neither the public, nor Mr. Toland, nor the District Attorney, nor the Court, knew that the officer who had shot Mr. Warren was a probationary officer, who had demonstrated a troubling propensity for violence in his brief career with the Alhambra Police Department, just one town over, and who was left on patrol to beat up Mr. Toland in his own driveway, in front of his family, a month later.

27. But the City Attorney knew that it also had to hide that information from the prosecutors at the District Attorney's Office, because they would correctly recognize it as *Brady* evidence, and turn it over to the defense. So the City Attorney told the Police Department not to tell the DA about Officer McFarland. The City Attorney knew full well that by so doing it was deliberately depriving Mr. Toland of his constitutional rights. It knew that Mr. Toland's defense was that Officer McFarland had used excessive force and beaten him without justification, and who that he a constitutional right to all exculpatory evidence.[4]

28.  The City Attorney set out to hide evidence from the DA, the defense, and the Court, because it decided that a cover-up was better than accepting responsibility for having hired an unfit and violent police officer.

29.  The City Attorney instructed the Police Department not to tell the Deputy District Attorney assigned to the Toland case that Officer McFarland had been the

---

[4] Under *Brady v. Maryland*, 373 U.S. 83 (1963)

shooter in the Warren case, despite the fact it was obvious *Brady* evidence, and despite the fact that Toland's express defense at his preliminary hearing was that Officer McFarland had used excessive force without justification.

30.  There is no doubt whatsoever that this information was *Brady* evidence. Both the judge and the prosecutor said so.  The judge expressed "outrage" that the information had been withheld, and the prosecutor produced the information to the defense immediately after it was revealed (almost two years into the case), and then dismissed the assault charges against Mr. Toland.

**The City Attorney's Lawlessness and Violations of Jeffrey Toland's Rights**

31.  The City Attorney's Office obstructed justice when it directed the Police Department to withhold this information from the District Attorney and when it directed the Police Department not to write any internal report about Officer McFarland.  Because of the City Attorney's obstruction, the District Attorney didn't find out until March 2021—nearly two years later—that Officer McFarland had been the shooter in the Warren case.  Unlike the City Attorney's Office, the District Attorney's office followed the law, disclosed the information, and dismissed the charges against Mr. Toland. The prosecutor stated on the record that her office could not proceed with the case against Mr. Toland in light of the disclosures.

32.  The City knew that if it provided full discovery—something it knew it was constitutionally obligated to do—in the Toland case, Officer McFarland's history would be revealed and the ugly facts about the Warren shooting would come to light.

33.  The Warren killing was obviously, quintessential *Brady* evidence.  Just as he had in the Warren shooting, Officer McFarland panicked, initiated violence, and escalated the violence against Mr. Toland. Then he lied about it.

34.  The City Attorney's Office knew that Mr. Toland was constitutionally entitled to production of all documents, records, and materials that have a reasonable probability of affecting the outcome of the case.  The City Attorney's Office knew that the *Brady* obligation extends to information known to the police department and everyone else acting on the government's behalf.  And the City Attorney's Office knew that the District Attorney's Office would follow its constitutional obligations and disclose the information about Officer McFarland if the Police Department produced it to the District Attorney.

35. Moreover, the City Attorney's Office also knew that if the Police Department prepared any kind of internal report on Officer McFarland's behavior, it would include all of the above.  So, it advised the Police Department not to conduct any internal investigation or create any reports. In fact, the City Attorney's Office—through Deputy City Attorney John Nam—told the Police Department hold back on both investigations or reports until Mr. Toland's time to sue had run out, two years later.

36.  This is the height of government lawlessness: A City Attorney's Office tells a Police Department not to investigate an alleged use of excessive force for two years, for the explicit reason that if the department did investigate, "it would lead to litigation."  In other words, the City Attorney knew exactly what Officer McFarland was and the potential liability they faced because of him.  But rather than take away his badge and gun, they decided to simply hide the facts, keep Mr. Toland from finding out about Officer McFarland, and see if hiding that exculpatory evidence could help them "get him a conviction."

37.  The City Attorney's Office knew that if Mr. Toland and his counsel learned that Officer McFarland had six prior use-of-force incidents in the preceding year at Alhambra, and only four weeks earlier had shot and killed another Pasadena citizen, that Mr. Toland would have both a strong defense in his

criminal case, not to mention a strong civil-rights lawsuit against the City and the officers.

38.  The City Attorney's Office broke the law to avoid civil liability. But it got caught, and now it faces civil liability.

**The City Attorney's Obstruction Is Exposed by an Honest Police Officer**

39.  The City got caught because someone in the Police Department—an officer whose name Mr. Toland does not presently know, but who is clearly brave and honest and believes in justice under law—found out what the City Attorney was doing and knew that it was wrong—and that brave officer gave all the materials to the judge on a flash drive.  When the City Attorney's Office found out, it sent its Chief Deputy City Attorney, Javan Rad, to appear in court and demand that the judge return the flash drive.  But the judge knew *Brady* evidence when she saw it and refused to give in to Mr. Rad's demands.

40.  The express attempt in open court by the City, by and through its Chief Deputy City Attorney to prevent disclosure of *Brady* material is irrefutable evidence of an illegal and frightening policy of the Pasadena City Attorney's Office. By sending its Chief Deputy City Attorney to court to demand return of *Brady* materials it had tried to hide, the City proved its creation of, adherence to, and ratification of a policy of obstructing justice.

41. The City Attorney's act in telling the Police Department to withhold evidence from the District Attorney's Office and the defense as well as telling the Police Department not to hold back on any internal investigation of Officer McFarland's until the statute of limitations for Mr. Toland's civil rights lawsuit had expired, was a deliberate and considered act in accordance with the City Attorney's wrongful policy and practice.

42. In enacting this policy, the City knowingly attempted to procure the wrongful and unconstitutional conviction of Mr. Toland, one of its own residents, whom it was supposed to protect and defend.

43.  Finally, according to the testimony of Lieutenant Kimberly Smith (who may well have been the courageous officer who provided the materials to the judge) this was not an isolated incident .  Lieutenant Smith testified that she could think of "ten or fifteen" instances where internal use-of-force reports had been halted for one or two years—just long enough for the statute of limitations to run on a wronged citizen's civil rights suit.

44.  It shocks the conscience that a City Attorney's Office would direct such an action.  But it did.  Hiding exculpatory evidence from a criminal defendant is blatantly illegal and unconstitutional, as every lawyer in the United States knows. But the City Attorney's Office did it—deliberately—in order to try to shield the City from civil liability for the actions of a violent police officer.  They deliberately attempted to procure the wrongful conviction of Mr. Toland in order to prevent Mr. Toland from suing the police officers who beat and choked him.  The court  was right to describe the City Attorney's Office's actions as "outrageous."

45. Fortunately, the worst possible outcomes of the City Attorney's efforts were avoided, although only by the tenacity of the trial judge and the brave and honest actions of the unnamed officer who provided the exculpatory evidence to the court despite the City Attorney's attempts to hide it.

46. When the prosecution finally saw the exculpatory evidence, it dismissed the charges against Mr. Toland, and a grave miscarriage of justice was narrowly avoided.

47. The judge stated that in 26 years on the bench, she had never seen such an outrageous attempt to by a city to interfere in the criminal discovery process.  She stated that the City Attorney's actions undermined public trust in the integrity of

the criminal justice system, and that the District Attorney's Office should investigate the Pasadena City Attorney's Office "at the highest levels," to ensure that what happened to Mr. Toland "never, ever happens again."

48. Accordingly, Mr. Toland brings this suit to hold these officers and the City Attorney's Office accountable for their actions, because no other government agency will do so.

49. The Court stated that it was shocked and outraged. Mr. Toland was also shocked and outraged. And the public should be shocked and outraged. It eviscerates the public trust in the integrity of our criminal justice system when City officials who should not have anything to do with criminal prosecution secretly conspire to hide exculpatory evidence from the defense in order to shield violent officers from civil lawsuits. The Court's comments from the bench need no elaboration: ***"This should never, ever happen again."***

50. By this lawsuit, Mr. Toland seeks to ensure that it never does.

## JURISDICTION, PARTIES AND VENUE

51. The claims alleged herein arise under the Constitution and laws of the United States, giving this court jurisdiction under 28 USC § 1331. This Court has subject-matter jurisdiction over this action because the case arises under the Fourth and Fourteenth Amendments to the United States Constitution, and under Title 42 §§ 1983 *et seq*. of the Unites States Code.

52. Any additional claims arising from the acts and omissions herein alleged are supplemental in nature as that term is interpreted for the purposes of 28 USC §1367.

53. Venue is proper in this Court because Mr. Toland and the Defendants reside in this District. Further, all or a substantial part of the events or omissions giving rise to the claims for relief occurred in this District.

54.  Mr. Toland is 58 years old.  He lives in Pasadena, in Los Angeles County, California, within the Central District of California.

55.  Defendant Zachary McFarland ("Officer McFarland") was, at all relevant times, an officer with the Pasadena Police Department. He committed the acts at issue herein during the course and scope of his employment with the Pasadena Police Department, within the Central District of California.  He is sued in his individual and official capacities.

56.  Defendant Stephanie Lack ("Officer Lack") was, at all relevant times, an officer with the Pasadena Police Department. She committed the acts at issue herein during the course and scope of her employment with the Pasadena Police Department, within the Central District of California.  She is sued in her individual and official capacities.

57. Defendant John Nam ("Mr. Nam") was, at all relevant times, a Deputy City Attorney in the Pasadena City Attorney's Office. He committed the acts at issue herein during the course and scope of his employment with the Pasadena City Attorney's Office.  He is sued in his individual and official capacities.

58. Defendant Pasadena City Attorney's Office ("City Attorney's Office" or "City Attorney") is an agency of the City of Pasadena.  As set forth herein, it is properly sued under *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978) because it committed the acts at issue herein pursuant to a policy, custom, and practice, and with the direction and ratification of relevant policymakers.

59.    Mr. Toland is ignorant of the true names and capacities of defendants sued herein as Does 1 through 10, inclusive, and therefore sue said defendants by fictitious names.  Mr. Toland will amend this complaint to allege their true names and capacities when they are ascertained.

60.  Mr. Toland is informed and believes and therefore alleges that each of the fictitiously named defendants was responsible in some manner for the occurrences herein alleged, including without limitation aiding and abetting the wrongful acts of Defendants as set forth herein, and that Mr. Toland's injuries as herein alleged were proximately caused by said Defendants.

61.  Mr. Toland is informed and believes and therefore alleges that Defendants were the agents of their co-defendants and in doing the acts herein alleged were acting within the scope of such agency and with the permission of their co-defendants.

## STATEMENT OF FACTS

### Officers McFarland and Lack Beat and Choke Mr. Toland, and then Lie About It

62. The photos below are taken from Officer McFarland's dashboard camera and body camera.  The testimony quoted herein was given under oath by Officers McFarland and Lack, respectively.

63. At approximately 10:10 p.m. on June 21, 2019, Mr. Toland was driving his teenage daughter home from a friend's house. Approximately one mile from the Toland family's home, at the intersection of St. John Avenue and Del Mar Boulevard, Mr. Toland turned right onto Del Mar.

64. Defendant Zachary McFarland ("Officer McFarland"), who was 26 years old and was a probationary Pasadena police officer, and had been employed by the Pasadena Police Department for less than a year, was on patrol in the area.  He was about 200 to 300 feet away from Mr. Toland's vehicle when Mr. Toland made the turn.

65.  Officer McFarland decided to follow Mr. Toland.  The reasons for his decision remain unclear.  Mr. Toland did not violate any traffic laws, and was never given a traffic ticket.

66.Officer McFarland followed Mr. Toland as he headed toward his home, down Del Mar, to Orange Grove, to Ellis.  He later claimed that Mr. Toland's brake lights "were not working properly."  However, the dashboard video from Officer McFarland's vehicle proved this statement to be false.  The image below is from Officer McFarland's dashboard camera, just seconds before he activated his flashing lights.

67. In fact, as the following image from his dash-cam shows, Officer McFarland plainly saw Mr. Toland's brake lights working normally.



68.  When confronted at the preliminary hearing with the above video, clearly showing the brake lights working normally, Officer McFarland claimed that although in real time, to the naked eye, they appeared to be working normally, when the video was slowed down and viewed frame by frame, the right rear brake light illuminates approximately one frame (or one twentieth of a second) after the center and left brake lights.

69. Officer McFarland claimed at the preliminary hearing, for the first time, that he had actually seen that twentieth-of-a-second delay, and that it was the reason for the traffic stop.  He also claimed that such a twentieth-of-a-second delay constituted a violation of California motor vehicle laws.

70.  Officer McFarland's claim was false as a matter of fact and baseless as a matter of law.[5]

71.  Officer McFarland never mentioned this claimed "twentieth-of-a-second delay" observation to anyone that night—not to Mr. Toland, and not to Officer Torres, to whom he dictated his narrative of events.

72. In fact, Officer McFarland never told *anyone* that he had supposedly seen this claimed twentieth-of-a-second delay until November 2019, after Mr. Toland filed a brief with the Court including the video, which showed the brake lights working normally.[6] The assigned Deputy District Attorney brought Officer McFarland to her office to review the video and Mr. Toland's brief, and it was at that meeting, apparently, after being shown his own video showing the brake lights working normally, that Officer McFarland first "remembered" that he had seen a twentieth-of-a-second delay.

---

[5] Officer McFarland knew, and should have known, that there is nothing in the California Vehicle Code that suggests that one brake light illuminating a twentieth of a second after another light is a violation of any kind.  When confronted with this fact in court, Officer McFarland claimed that any lack of perfect simultaneity constituted a violation Vehicle Code section 24252(a).  But Vehicle Code section 24252(a) states only that a vehicle's brake lights must be in "good working order." No reasonable person would believe, and Officer McFarland did not have any basis for believing (nor did he in fact believe when he pulled Mr. Toland over), that Vehicle Code section 24252(a) justified a stop on the grounds of a twentieth-of-a-second illumination delay that was not visible to the naked eye.  Simply put, McFarland's statements made months later were after-the-fact fabrications.

73.   After following Mr. Toland for around a minute, Officer McFarland activated his overhead lights.  Mr. Toland, who was only about 100 yards from home and was traveling slowly, turned on his right-hand turn indicator and reached his arm out his window, waving and pointing to his right to indicate where he was going.  He continued to his home and pulled into his driveway.  He came to a stop 27 seconds after Officer McFarland activated his lights.

74.   Mr. Toland and his daughter prepared to get out of the car.  Mr. Toland opened the driver's side door.

75.   Officer McFarland pulled up on the street behind Mr. Toland's driveway, got out, walked up to the driver's door, which was open.  As he walked up the driveway, Mr. Toland smiled and turned and started to get out of the car to greet Officer McFarland.

76.   Officer McFarland put his hand on Mr. Toland's shoulder and roughly pushed him back into the car, saying "Stay in the car.  Stay in the car."

77. The following image is from Officer McFarland's body camera, and shows him pushing Mr. Toland:



78.   Officer McFarland requested Mr. Toland's driver's license and other documents.  Mr. Toland provided his insurance card and stated calmly that he would need to go inside to get his license.  Officer McFarland refused to let him go inside, again ordering him to stay in the car.

79.   Officer McFarland then said: "When the red lights come on, state law says you have to pull over."  Mr. Toland asked what he was being pulled over for.  He asked four times before Officer McFarland answered.

80.   First, Mr. Toland asked "Has there been a breach of the peace?"  Officer McFarland responded "Yes, there has been.  You have a vehicle code violation on your car and that's why I'm pulling you over."  Mr. Toland then asked two more times what that violation was.  Officer McFarland refused to answer, responding instead each time: "What's your last name?"  Mr. Toland then began asking again and Officer McFarland interrupted him, again not answering the question, saying, "You are being detained for a traffic code violation."  "Which is what?" Mr. Toland asked.

81.   Only Officer McFarland knows what he was thinking at the time, but it appears from the video that Officer McFarland was trying to think of something to say to justify the stop.  Finally, after the fourth request from Mr. Toland, he responded "Your brake light is not working properly."  As noted, the video from Officer McFarland's dashboard camera proves that that statement was not true, and that in fact Officer McFarland had observed Mr. Toland's brake lights working normally before pulling him over.

82.   Officer McFarland then asked Mr. Toland's name, and Mr. Toland told him. "My name is Jeff Toland."

83.   Officer McFarland then repeatedly addressed the 55 year-old Mr. Toland as "Jeff," and berated him for not stopping immediately. "Jeff, is there a reason that you did not pull over when I pulled you over?"  Mr. Toland answered "Because I

was right here."  Officer McFarland: "What's right here?" Mr. Toland: "Home."
Officer McFarland: "That's not an excuse.  You are required by law."  Officer
McFarland's tone was aggressive and belligerent.

84.  Mr. Toland, sensing Officer McFarland's tone and increasing agitation, and
hoping to de-escalate the situation (and concerned for his daughter, who was still
in the car), tried to placate Officer McFarland. "I respect what you're doing, you
know, because you're out here, you know, taking care of whatever you have to
take care of.  You know, so I do respect that, but I haven't done anything."

85.Officer McFarland responded: "You've committed a vehicle code violation
which is grounds for me to stop you."  He then said, again, "Tell me your last
name," which Mr. Toland had already told him.  Mr. Toland did so again, spelling
it out and gave Officer McFarland his date of birth and address.  After calmly
providing that information, Mr. Toland asked again "What was the reason for
pulling me over?"  Officer McFarland refused to answer: "I already explained that
to you, sir."  Mr. Toland was confused because he knew that his brake lights were
working normally.  At this point Mr. Toland asked his daughter if she wanted to go
inside.  Officer McFarland said sarcastically: "Is this your daughter? Are you
setting a good example right now for your daughter?"  This comment, and Officer
McFarland's tone, were nasty, unprofessional, and unnecessary.

86.  Officer McFarland stood over Mr. Toland in the open driver's door during
this entire interaction, mere inches from him.  McFarland was shining his flashlight
directly into Mr. Toland's eyes, causing Mr. Toland to flinch and try to shield his
eyes, as shown in the following image from Officer McFarland's body camera.
McFarland's conduct was neither necessary nor appropriate.

87. At this point Defendant Stephanie Lack, another Pasadena Police Department officer, walked up the driveway.  She had seen Officer McFarland's car parked on the street and stopped to see if he needed assistance.  Officer McFarland greeted her, then gestured toward Mr. Toland and said "Extremely un-co-op."  (Mr. Toland, as the video confirms, had done nothing uncooperative.)

88. Officer McFarland and Officer Lack then asked Mr. Toland more questions about the car—but still would not let him go into the house to get his wallet. Officer McFarland then ordered Mr. Toland to get out of the car while still standing there mere inches from him in the open driver's side doorway, blocking his exit.

89.  Mr. Toland obeyed the command and leaned forward to step out of the car. Officer McFarland simultaneously reached down and grabbed Mr. Toland's left arm and pulled on it, despite Mr. Toland being in the act of complying with the command. In the image below, from Officer McFarland's body camera, Officer

McFarland's right arm is shown on the lower right, reaching in to grab Mr. Toland's left arm as Mr. Toland steps out of the vehicle.



90.  Officer McFarland leaned back and twisted his body as he pulled on Mr. Toland's arm.  This action was improper and contrary to applicable norms and best practices.  There was no reason for Officer McFarland to grab Mr. Toland and try to pull him out.  Mr. Toland was attempting to comply as Officer McFarland pulled on him.  And there was no reason for Officer McFarland to be standing in the doorway, directly on top of Mr. Toland, in the first place.

91.  The proper conduct in this situation would have been for Officer McFarland to step back and give Mr. Toland room to exit the vehicle.  Instead, Officer McFarland chose to grab Mr. Toland's arm while standing almost directly on top of him.  As Officer McFarland did so, he lost his balance and stumbled sideways, while still holding Mr. Toland's left arm with his right hand.

92. Officer McFarland then yelled "Don't tense up on me!"

93. When describing the incident to other officers afterward, Officer McFarland lied.  He told them that Mr. Toland had leaped out of the car, gotten behind him, and wrapped his arm around Officer McFarland's neck in an "arm bar," for five

seconds, causing Officer McFarland to almost lose consciousness.  This story was false, as demonstrated by video evidence, Officer Lack's sworn testimony, and Officer McFarland's own later admissions.

94.  Officer McFarland immediately grew angry and violent.  By his own later admission, after pulling and twisting on Mr. Toland's arm, during which act he claims Mr. Toland's arm made contact with his neck as he pulled and twisted, he straightened up and stepped back from Mr. Toland.  Then, while facing him and not in contact with him, deliberately punched Mr. Toland in the face.

95.  The following is Officer McFarland's testimony regarding punching Mr. Toland in the face:

Q: So you were no longer—after one to three seconds, you were no longer in physical contact with Mr. Toland?

A: Correct.

Q: And it was at that point that you made the decision to punch him in the face?

A: Yes, it was.

Testimony of Officer McFarland, Jan. 22, 2020, at 150:26-151:4.

96.  Punching someone in the face without warning is the definition of a "sucker punch." That is not how police officers should behave.

97.Punching Mr. Toland in the face was inexcusable and unjustified.  Officer McFarland punched Mr. Toland while he was standing facing Mr. Toland and not in physical contact with him.  There was no legal basis for his punching Mr. Toland in the face.

98.  Officer McFarland then grabbed Mr. Toland around the waist and tackled him to the ground.  He then punched Mr. Toland approximately a dozen times in the head. He then Tased him twice and, as Mr. Toland sat on the ground, stood

behind Mr. Toland, putting his arm around Mr. Toland's throat and attempted to choke Mr. Toland into unconsciousness.

99.   Officer Lack radioed for assistance when Officer McFarland tackled Mr. Toland.  She then joined Officer McFarland as he tried to choke Mr. Toland. She put her arm around Mr. Toland's neck as well, and attempted to choke him into unconsciousness.

100.     Officer McFarland lied about why he did these things.  He told the other officers who responded that Mr. Toland had leaped out of the car, gotten behind him, and applied an "arm bar" around his neck for "five seconds," until he "felt himself losing consciousness."  That did not happen.

101.     Officer Lack made deliberately false statements as well.  She signed a report stating that she had seen Mr. Toland "violently attack" Officer McFarland. In fact, she later admitted that she never saw anything of the kind.  Under oath, her testimony was as follows:

Q: You also wrote in your report, didn't you, that "Mr. Toland violently attacked Officer McFarland as he was stepping out of the vehicle."  Is that what you wrote?

A: Yes.

Testimony of Officer Lack, Feb. 7, 2020, at 259:20-24.

Q: So Ma'am, isn't it true that, in fact, you did not witness Mr. Toland, quote, violently attack Officer McFarland as Mr. Toland was stepping out of the vehicle.  You didn't see that, did you?

A: No.

Testimony of Officer Lack, Feb. 7, 2020, at 261:6-10.

…

102.     Officer Lack signed a false police report, falsely stating that she saw Mr. Toland attack Officer McFarland, despite knowing that she had in fact seen no such thing.

103.     Officer Lack also failed to tell anyone that in fact she had not in fact seen Mr. Toland violently attack Officer McFarland—until she was subpoenaed by defense counsel and placed under oath.  This is her testimony:

Q: At any time did you tell any representative of the District Attorney's Office that you, in fact, did not see Mr. Toland attack Mr. McFarland?  Did you ever tell anyone that before today?

A: No.

Testimony of officer Lack, Feb. 7, 2020, at 280:5-9.

104.     Officer Lack made these admissions—that she signed a false police report claiming to see an "attack" that she in fact never saw and that she then kept quiet about it—under oath, in open court, on February 7, 2020, in the presence of a Deputy District Attorney.  Yet as of the date of this Complaint, she remains an active member of the Pasadena Police Department. She has not been disciplined, fired, or charged with making a false police report.

105.     Officer Lack also stated, under oath, that despite the fact that she was standing approximately three feet away when Officer McFarland punched Mr. Toland in the face and tackled him to the ground—acts which he testified under oath he committed right in front of her—she had no recollection of seeing either event.  The following is her testimony:

Q: Did you see him punch Mr. Toland in the face while standing next to the door of the car?

A: No.

Testimony of Officer Lack, Feb. 7, 2020, at 272:16-18.

106.     Officer Lack admitted that she saw Mr. Toland and Officer McFarland standing by the car door, with their hands down at their sides, and that Mr. Toland did not do or say anything violent or threatening.  Incredibly, though, Officer Lack—who was standing right next to Mr. Toland and Officer McFarland when Officer McFarland threw Mr. Toland to the ground—claimed she had "no memory" of how Mr. Toland ended up on the ground.  The following is her sworn testimony:

Q: Did there come a time when Mr. Toland ended up on the ground?

A: Yes.

Q: Did Mr. Toland end up on the ground after you had reached the side of the vehicle where he was standing with Officer McFarland?

A: Yes.

Q: Were you able to observe the manner in which Mr. Toland ended up on the ground?

A: No.

Q: So I'd like to direct your attention to your observations beginning at the point you've just identified: when you come around the side of the vehicle, and you're able to see Mr. Toland and Mr. McFarland.  Your testimony is that there came a point in time after that that Mr. Toland ended up on the ground; correct?

A: Yes.

Q: Were you able to see how it happened?

A: I do not know how it happened.  I was there, but I do not know how he went from standing to being on the ground.

Testimony of Officer Lack, Feb. 7, 2020, at 248:21-249:13.

Q: If I understand your testimony correctly, I asked you what happened next, and you said your next memory is that he was on the ground; correct?

A: Correct.

Q: I would like, if I could, to focus your memory on how that happened.  Do you have a memory of how Mr. Toland came to be transferred from a standing position to being on the ground?

A: I do not.

Q: When it came to him moving from a standing position to being on the ground, you were about six inches away; correct?

A: Correct.

Testimony of Officer Lack, Feb. 7, 2020, at 257:23-258:7.

Q: Do you have any memory in your head, as you sit here today, of the manner in which Mr. Toland came to go from a standing position to being on the ground?

A: No.

Testimony of Officer Lack, Feb. 7, 2020, at 262:8-10.

107.     Officer Lack's testimony at the preliminary hearing that she had no memory of events that happened directly in front of her, three feet away, while she was watching, is neither true nor credible.  In fact, Officer Lack watched Officer McFarland punch Mr. Toland and push him to the ground, without justification.

108.     It is a violation of the trust Americans must place in our police officers for a police officer to come into court and testify under oath in detail about an incident, then claim to have "no memory" of alleged misconduct committed by another officer right in front of her.  Officer Lack was standing directly next to Officer McFarland, when Officer McFarland—by his own admission—punched

Mr. Toland in the face and tackled him to the ground.  But Officer Lack claimed, under oath, that she didn't see Officer McFarland punch Mr. Toland, and simply had no idea how Mr. Toland ended up on the ground.  False testimony and selective failures of memory from public officials endanger the public and everyone's rights under the Constitution.

109.      Officer Lack's absence of any memory of what she saw Officer McFarland do—while standing three feet away from him, watching him—could have been remedied by footage from her body camera.  But for unknown reasons, the footage from Officer Lack's body-worn camera is lost or missing: it was never provided to the District Attorney, the defense, or the court.

110.      Officer McFarland made false statements at the preliminary hearing, claiming that Mr. Toland had assaulted him and that he was "extremely afraid for [his] life."  He claimed that as he tried to pull Mr. Toland out of the car "using my leverage in a twisting motion," Mr. Toland brought his right arm up to Officer McFarland's throat and "applied pressure" to it.  That testimony is false.  Officer Lack admitted under oath that she did not see any such thing.

111.      Officer McFarland also falsely claimed at the preliminary hearing that when he threw Mr. Toland to the ground, he fell under Mr. Toland and was pinned under him.  Officer McFarland's testimony follows:

Q: Did you eventually go to the ground?

A: Yes, I did.

Q: Describe for us how that happened.

A: When we fell to the ground, the defendant landed on top of me, on my right side.  He stayed on top of me.  Even after I gave him commands to get off me, he continued to stay on top of me.

Testimony of Officer McFarland, Jan. 22, 2020, at 73:21-27.

112.     Officer McFarland's testimony was false and it was directly contradicted by Officer Lack's sworn testimony.  Officer Lack—who was three feet away and watching—testified that Officer McFarland was never on the ground at all.  The following is her testimony:

Q: When you saw Mr. Toland on the ground, you were able to observe that neither you or Officer McFarland was on top of him, correct?

A: Correct?

Q: Officer McFarland was not lying on the ground; correct?

A: No.

Q: You never saw Officer McFarland lying on the ground; correct?

A: No.

Testimony of Officer Lack, Feb. 7, 2020, at 10:-23.

113.     It was at this point, while Mr. Toland was seated on the ground on his driveway, neither saying nor doing anything threatening, and not in physical proximity to Officer Lack or Officer McFarland, that they made the deliberate decision to grab Mr. Toland around the throat and try to choke him into unconsciousness by cutting off the blood flow to his brain.  They did this as Mr. Toland was simply sitting still with his hands on the ground, saying "I didn't do anything." Their intent is confirmed by Officer Lack's testimony:

Q: It's an attempt to cut off blood flow to the brain to render the victim unconscious; right?

A: Correct.

Q: You were attempting to render him unconscious by squeezing your arm under his neck; correct?

A: Correct.

Testimony of Officer Lack, Feb. 7, 2020, at 267:18-23.

114.	The officers grabbed his throat, one from each side, and began choking Mr. Toland while he was seated on his driveway, with his hands on the ground, not touching anyone or saying or doing anything violent, but simply staying in a seated position.  Officer McFarland confirmed this:

Q: He's in a seated position, and you and Officer Lack are behind him; correct?

A: We're—I think Officer Lack might be behind him.  I'm on his left side, I believe.

Q: What you wanted him to do was lie down on his stomach?

A: Correct.

Testimony of Officer McFarland, Jan. 22, 2020, at 154:1-9.

115.	Because Mr. Toland remained seated, and did not lie down on his stomach, both officers reached around his neck and squeezed, attempting to cut off blood flow to his brain and render him unconscious.

Q: She used her arm, put it around Mr. Toland's neck, and squeezed?

A: Correct.

Q: You recognized that to be a carotid control hold?

A: I did.

…

Q: You subsequently also put your arm around Mr. Toland's throat and tried to squeeze with a carotid control choke hold; correct?

A: Correct.

Testimony of Officer McFarland, Jan. 22, 2020, at 154:25-155:12.

116.	Officer McFarland and Officer Lack violated clearly established law when they applied a chokehold to Mr. Toland as a response to "passive resistance," *viz.*, sitting still on his driveway.

117.     A chokehold—the application of force to a person's neck to cut off blood flow—is deadly force, whatever name (e.g., "carotid control hold") it is given.

118.     It is clearly established law that officers may not employ a chokehold to overcome passive resistance such as the failure of a person to obey a verbal command.

119.     When Officer McFarland and Officer Lack grabbed him around the throat and tried to choke him into unconsciousness, Mr. Toland instinctively tried to save his life.  He reached up with both hands and grabbed hold of the two arms around his neck (Officer Lack's and Officer McFarland's) in a desperate attempt to keep breathing.

120.     In response, Officer McFarland, while continuing to try to choke Mr. Toland with his right arm, punched Mr. Toland in the head and face between ten and twenty times with his left hand.

121.     Officer McFarland also Tased Mr. Toland twice.

122.     Officer McFarland and Officer Lack could have killed Mr. Toland with the chokehold they were applying to his throat.

123.     Despite the barrage of punches to the head,  Mr. Toland, thankfully, was able to stay conscious and keep Officer Lack's and Officer McFarland's arms away from his throat and carotid arteries until other officers arrived.

124.     Officer McFarland and Officer Lack then made false statements in their reports of the incident.

125.     In Officer McFarland's report (which he dictated to Officer Torres, and did not sign), he claimed that Mr. Toland had jumped out of the car, "maneuvered" behind him, and grabbed him around in an "arm bar" and choked him for "approximately 5 seconds" until he "felt himself blacking out."

126.     He later admitted that none of those things actually happened.

127.     Video confirms as well that none of those things actually happened.

128.     Officer Lack—who was three feet away—also confirmed under oath that she did not see any such things happen.

129.     Officer Lack, however, signed a report that same night claiming that Mr. Toland "violently attacked" Officer McFarland.

130.     She later admitted that in fact she never saw any such thing.  The following is her sworn testimony:

Q: So, Ma'am, isn't it true that, in fact, you did not witness Mr. Toland, quote, violently attack Officer McFarland as Mr. Toland was stepping out of the vehicle.  You didn't see that, did you?

A: No.

Testimony of Officer Lack, Feb. 7, 2020, at 261:6-10.

131.     Here is what Officer Lack actually saw:

Q: As far as what you saw, Mr. Toland was simply standing there with his hands at his sides; correct?

A: Yes.

Testimony of Officer Lack, Feb. 7, 2020, at 256:12-14.

132.     As a result of Officer McFarland and Officer Lack's false statements, both on the night of the incident and at the preliminary hearing, Mr. Toland was arrested and charged with felony counts of battery against a police officer and resisting arrest.

133.     Officer McFarland and Officer Lack gave the testimony set forth above, under oath, in court, at the preliminary hearing on the charges brought against Mr. Toland in the presence of a Deputy District Attorney.  Despite Officer Lack's admission that her signed report was false, her non-credible claim to have no memory of how Mr. Toland ended up on the ground, and the fact that her sworn

testimony directly contradicts Officer McFarland's, neither the District Attorney's Office nor the Police Department has taken action against Officer McFarland and Officer Lack.

134.    Neither Officer McFarland nor Officer Lack apologized for their false statements or showed any remorse for making them.

135.    No American should be subject to being punched, tackled, Tased, and choked, in his own driveway, during a routine traffic stop.

136.    Officer McFarland and Officer Lack committed the acts set forth above while on duty within the course and scope of their employment with the Pasadena Police Department.

137.    Mr. Toland was harmed by Officer McFarland's and Officer Lack's conduct.  He suffered significant physical injuries subject to proof at trial, when Officer McFarland and Officer Lack tackled, punched, Tased, and choked him.

138.    He suffered significant psychological and emotional harms, subject to proof at trial, because of Officer McFarland's and Officer Lack's conduct, which could easily have killed him and caused him to fear that he was about to be killed, and the fact that it occurred at his home, in his driveway, in front of his wife and young daughter, who were also traumatized and horrified at the violence Officer McFarland and Officer Lack inflicted on Mr. Toland.

139.    Mr. Toland was harmed by Officer McFarland's and Officer Lack's false statements because those false statements caused him to be arrested and initially charged with attempted murder.  He spent two days in custody on those charges, thinking he might be facing life in prison, before being informed that the District Attorney had reduced the charges. He suffered additional psychological and emotional harms from that time in custody under the threat of the unwarranted initial charges procured by Officer McFarland's and Officer Lack's false statements.

140.     Mr. Toland continues to suffer economic, psychological and emotional, and reputational harms caused by the pendency of the criminal charges, which continue to be buttressed by Officer McFarland's false statements (that Mr. Toland grabbed or hit his throat, and that Mr. Toland fell on top of him and pinned him to the ground); and by Officer Lack's false statements in claiming that she has no memory of the critical events that occurred directly in front of her, while she was watching.

141.     Officer Lack had a professional, legal, and moral duty to inform her superiors the night of the incident that she never saw Mr. Toland do anything violent or attack anyone, and that Officer McFarland was never on the ground. She should have done her duty and told the truth at the outset.  Instead, she elected to protect Officer McFarland and sign her name to a report she knew to be false.

142.     Police officers should be honest. They should not sign their names to false reports.

143.      Mr. Toland suffered significant reputational harms, subject to proof at trial, from being falsely accused by Officer McFarland and Officer Lack of "attacking" Officer McFarland.

144.      He suffered significant economic damages, subject to proof at trial, from being falsely accused by Officer McFarland and Officer Lack of "attacking" Officer McFarland.

### The City Attorney's Office Attempts to—and for a Time Succeeds in— Concealing Exculpatory Evidence

145.     The City Attorney's Office willfully, deliberately, and in conspiratorial fashion tried to impede or prevent this civil suit by concealing exculpatory evidence in Mr. Toland's unwarranted criminal prosecution.

146.     During a series of discovery hearings in the winter of 2020-2021, an extremely disturbing set of facts was revealed, as set forth in the following paragraphs.

147.     In sum, the Pasadena City Attorney's Office was fearful of facing civil liability for Officer McFarland's violent and illegal conduct and decided that the best way to prevent Mr. Toland from suing was to ensure that he was convicted of assaulting the officers.  But to ensure the conviction, the office would have to prevent the defense, the court, and the prosecution from learning about Officer McFarland's violent history. Furthermore they would have to prevent the Police Department from doing an internal use-of-force investigation into Officer McFarland.

148.     The office did both.  It acted—with, by and through its employees and agents, including at least Defendant Deputy City Attorney John Nam, Chief Deputy City Attorney Javan Rad, and Deputy City Attorney Arnold Lee—in a conspiracy to deliberately deprive Mr. Toland of his constitutional right to exculpatory evidence and with the specific intent to procure his conviction of a felony offense.

149.     These actions were conducted by the City Attorney's Office, pursuant to, as part of, in conformity with, and as ratified by, its practices and policies, and with the knowledge and approval of its policymaker.  The City Attorney's Office is therefore liable directly as a section 1983 defendant, under *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978).

150.     In criminal prosecutions, the prosecutor has a constitutional and ethical obligation to produce all exculpatory material to the defense.  That obligation extends to all materials in the possession of the investigating agency, in this case the Police Department. And in this case, in a blatantly illegal action that as attorneys they certainly knew was illegal, attorneys Nam and Rad, acting on

information and belief with the knowledge and approval of the City Attorney's Office for which they worked, interfered in the discovery process, directing the Police Department not to share numerous—indeed ultimately hundreds—of exculpatory documents with the prosecution so that the prosecution would not be able to provide them to the defense.  Attorneys Nam and Rad knew exactly what they were doing, knew that it was unconstitutional, and they did it anyway, all to save the City from having to pay out money to compensate a victim of excessive force.  They then tried to cover up what they did.

151.    Thankfully, a brave police officer knew that what the City Attorney's Office was doing was wrong and provided the court with the exculpatory materials.

152.    Those materials—materials that the City Attorney's Office and Mr. Rad and Mr. Nam deliberately conspired to and did attempt to prevent Mr. Toland and the prosecution from receiving—included, among other things, the following: (a) reports showing that Officer McFarland shot and killed another Pasadena citizen on May 17, 2019, only a month before he beat Mr. Toland; and (b) memos and emails showing that the Department had halted its use-of-force investigation of Officer McFarland's beating of Mr. Toland at the direction of the City Attorney's Office, *specifically in order to avoid potential civil liability* if Mr. Toland filed a civil rights lawsuit.

153.    On June 2, 2020, nearly a year after the incident (and cognizant of the fact that under state law the Department has only one year to discipline an officer for misconduct), Lieutenant Kim Smith, who runs Internal Affairs for the Department, wrote to her colleague Lieutenant William Grisafe, asking why the investigation into Officer McFarland had been halted.  Lieutenant Grisafe replied: "It sounds like the decision was made out of anticipation that it would lead to a lawsuit."

154.     In other words—we better not write any reports about this, because if we do, our conclusions might support a civil rights lawsuit.  It is shocking to think that a Police Department—which is obligated by law, by policy, and by a basic sense of decency and right and wrong—would choose to simply *not conduct an investigation* into two successive uses of deadly force by a probationary officer in the course of a single month, out of fear that doing so might "lead to a lawsuit."

155.     This decision raises a critical question, that this lawsuit seeks to answer: Are police departments accountable to the citizens and communities they serve, or not?  Are they allowed to simply bury their heads in the sand and refuse to investigate misconduct by their officers in the hopes of avoiding liability for what their officers do?  And are they allowed to bury evidence, while a man faces a wrongful conviction in order to avoid being sued?  Mr. Toland hopes that the answer is "no."

156.     There was no ambiguity about the plan of the City Attorney here: the goal was to prevent Mr. Toland from finding out about Officer McFarland's history, and to secure felony conviction of Mr. Toland while keeping Officer McFarland's history  secret.

157.     Sergeant Roldan, indeed, testified that he had gone to a meeting with multiple members of the Police Department leadership team, expecting to discuss the Toland case.  But when he arrived, he was told by the leadership team to drop the investigation and not create a written report.  The reason given was concern about a potential civil lawsuit by Mr. Toland. We now know that the Police Department was acting at the direction of the City Attorney.

158.     Sgt. Roldan gave that testimony under oath on November 9, 2020.  Sgt. Roldan consulted his calendar after the hearing and confirmed that the meeting took place on or about January 8, 2020.

159.     The Police Department's failure to conduct an internal investigation of Officer McFarland's use of deadly force against Mr. Toland was inexplicable, until it was revealed  that the Police Department was following the directives of the City Attorney's Office. Internal Affairs Lieutenant Kimberly Smith testified that Deputy City Attorney John Nam called her and told her to shut down any investigation of Officer McFarland "because he thought there might be litigation."

160.     He then  put in writing the official direction to the Police Department not to do any internal investigation of Officer McFarland until the statute of limitations for Mr. Toland's civil rights suit (two years) had expired.

161.     This is what Mr. Nam—a licensed attorney and state official acting under color of law and acting at the direction of, and consistent with the policies and practices of, the City Attorney's Office—wrote to the two Pasadena Police Department officers responsible for the internal investigation (Lieutenant Kim Smith and Sergeant Roger Roldan) on August 16, 2020. The officers had inquired of the City Attorney's Office why the internal investigation had not been conducted, 14 months after the incident.  Deputy City Attorney Nam wrote: "[F]or a federal lawsuit he has two years so I would recommend that we continue tolling until that timeframe passes."

162.     If not for the actions of one or more brave officers in the Department, who provided the relevant documents to the Court, despite the City Attorney's efforts to bury them, none of the City Attorney's acts or the exculpatory evidence might ever have come to light.

163.     The Court, on April 22, 2021, explained its surprise at the revelations about the City's actions: "I mean, we did not know until Mr. Rad came in and something was inadvertently disclosed, which again, I didn't make a finding it was inadvertent.  I tend to think the opposite.  I tend to think someone in the Police Department was troubled by it and disclosed it to me and not to Mr. Rad."

164.     Whoever that person was, he or she did the right thing.

165.     Moreover, the evidence and communications that were revealed strongly suggest, and Mr. Toland alleges based thereon, that the City Attorney's Office also told the Police Department not to do an internal investigation of Officer McFarland's fatal shooting of Daniel Warren a month previously, for the same reason. The fact that the City Attorney's Office put in writing its directive not to investigate the Toland incident until Mr. Toland's civil rights statute of limitations had expired strongly suggests that the City Attorney's Office had a policy and practice of giving this directive whenever it was concerned that a thorough investigation of a police use of force might uncover misconduct and thus trigger a civil rights lawsuit.  There was nothing implicit or "wink-wink" about the City Attorney's actions. A Deputy City Attorney, giving official advice to the Police Department, told the Department to not even *look* at the facts surrounding a violent use of deadly force against a Pasadena citizen—until the citizen's time to file a civil rights lawsuit had expired.  That is reprehensible.

166.     The City Attorney's Office, by and through Mr. Rad and Mr. Nam and/or other attorneys employed by the Office, also told the Police Department not to provide any of this material—the materials about Officer McFarland, and the communications from the City Attorney's Office telling the Department not to do an investigation—to the prosecution or the defense.

167.     Because the Police Department followed this direction, neither the prosecutor nor Mr. Toland knew of this material until it was finally disclosed in February and March 2021.

168.     The Police Department also withheld, at the direction of the City Attorney's Office, the multiple prior drafts of the written report memorializing Officer McFarland's account of the incident.  The Department provided only a single report to the prosecutor, who then provided it to the defense.  What the

Department did not tell the prosecutor was that that document was actually at least the *fourth* version, and that multiple material changes had been made to it over the course of those drafts.

169.    For example, Officer McFarland initially said he punched Mr. Toland in the face as a "distraction strike."  But then someone changed the word "distraction" to "defensive."  And Officer McFarland initially said that when there was "separation" between him and Mr. Toland when he punched him in the face. But then someone changed the report twice—the first time to add the allegation that Mr. Toland had grabbed Officer McFarland's arm, and then again (a second time) to add the further allegation that he had grabbed Officer McFarland's arm and wouldn't let go.

170.    These changes were not accidental.  For one thing, there is no discussion of "distraction strikes" in the Department's policy manual.  Thus, a "defensive" strike would on its face appear to be justified; a "distraction" strike would not.  So, to try to bolster the City's position, someone simply changed what Officer McFarland said.

171.    The second change follows from the first change; if you're going to describe the punches as "defensive," then you obviously can't have Officer McFarland saying that he was not in contact with Mr. Toland when he hit him. You have to change the report to make it say that Mr. Toland had grabbed him. And then, finally, someone decided to throw in a few more colorful details, adding that Mr. Toland had grabbed Officer McFarland and "wouldn't let go."

In short, this is the nightmare of every American who fears encounters with the police, and of all Americans—including all good cops—who care about honesty and integrity in our criminal justice system.  But Mr. Toland could not wake up from what happened here: The police department keeps a violent cop on the street. When the cop beats and chokes a citizen, the police edit factual narratives to make

the unjustified use of force appear legal. No one records the violent cop's actual contemporaneous statements, and then the edited draft—the fourth draft—of the narrative is all the defense is ever given. Only the final draft of these incomplete reports was given to the prosecutor and the defense. As a result, it wasn't until a year later, when some brave Police Department employee gave that flash drive to the Court, that Mr. Toland was ever able to find out about all the changes.

172.      None of this was an innocent mistake.  The Department had seventeen (17) officers responding at various points during the night with body cameras recording their activities.  Yet the only interview that was *not* recorded was the verbal account given by Officer McFarland. And the various rounds of edits all passed through the desk of Sgt. Gligorivich, who was also, supposedly, responsible for conducting the Department's initial use-of-force review (a review that was—at the direction of the City Attorney—never conducted).

173.      The evidence strongly suggests that the Department first ensured that there *was no* detailed, contemporaneous record (by allowing Officer McFarland not to write anything down and then failing to record his verbal statement) and then repeatedly edited the report supposedly memorializing his statement in order to make his use of force appear justified. This was done rather than follow the Department's own policy manual, which requires the creation of a detailed, contemporaneous record of exactly what happened and evaluation for compliance with legal standards for the use of force.

174.      And at some point during the process, the body-cam footage of Officer Lack—which would have provided a clear view from an observer standing three feet away of exactly what happened—was lost, destroyed, erased, or never preserved at all.  We may never know exactly what happened with her body-worn camera that night.  But none of the other seventeen (17) cameras malfunctioned that night. If it was a coincidence that the one camera that would have shown

exactly what Officer McFarland did malfunctioned without any explanation, it was a fortunate coincidence indeed for the City.

175.     All of the intentionally withheld material was *Brady* evidence. The prosecution stated on the record, on the day it dismissed the charges against Mr. Toland, that its decision not to continue the prosecution was based on its review of the withheld material.

176.     That statement came on April 22, 2021—nearly two years after Mr. Toland's arrest. Here it is: "Thank you, Your Honor.  In addition to the Due Process error that was committed during the preliminary hearing, the additional Brady evidence which has been turned over to both the People and the defense, specifically the officer-involved shooting that Officer McFarland was involved with a few weeks prior to his contact with Mr. Toland; and as well as six prior incidents while he was employed with the Alhambra Police Department, while all of those were deemed to be have been uses of force that were within policy, coupled with the jury instructions, the People feel that proving the felonies in Counts 1, 3, and 4[7] would be difficult beyond a reasonable doubt…. [T]he decision was made not only by myself, but my head deputy and along with my bureau director."

177.     During the nearly two years between June 22, 2019, and April 22, 2021, Mr. Toland suffered every day the fear, anxiety, and uncertainty of being a defendant charged with serious felony offenses carrying potential years-long prison sentence. This caused him—as it would any reasonable person—great psychological and emotional harms.  During the same time, Mr. Toland had to expend a significant amount of money to fund his criminal defense.  All of this could and should have been avoided if the City Attorney's Office had not

---

[7] Count 2 had already been dismissed.

interfered and prevented the District Attorney's Office and the Police Department from doing their jobs.

178.     In sum, the City Attorney's Office, through Mr. Nam and Mr. Rad (who are both licensed attorneys and who both did know and should have known better) told the Police Department to not conduct any internal investigations of, or write any reports about, an officer who in the space of a month had killed one citizen and beaten and choked another. This directive was issued for the *specific reason* that if the Department did such an investigation, the findings might support a civil rights suit against the Department.

179.     On information and belief, Mr. Nam and Mr. Rad are not rogue actors acting against the policies and practices of the City Attorney's Office.  On the contrary, their actions—actions which they knew and should have known constituted deliberate deprivations of Mr. Toland's civil rights and deliberate obstruction of the criminal justice process—were carried out in conjunction and in conformity with, at the direction of, and as ratified by, the policies and practices of the City Attorney's Office.

180.     On information and belief, the City Attorney's Office maintains a policy and practice of deliberately interfering in the criminal justice process to deprive defendants of exculpatory evidence, in order to attempt to avoid civil liability in civil rights lawsuits.

181.     These policies and practices are pervasive and evidenced by the testimony of multiple witnesses, including Lieutenant Kim Smith and Sgt. Roger Roldan, who testified that this was not the first time that a use-of-force investigation had been halted in order to avoid civil litigation.  Lieutenant Smith testified that it had happened *ten or fifteen times* before.  That is proof that the City Attorney's Office had a policy and practice of concealing officer misconduct and is

thus directly liable under *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978).

182.     Further, in August and September 2021, the prosecution and defense held three teleconferences with Superior Court Judge Terri Schwartz regarding possible resolution of the case.  During these calls, Judge Schwartz asked DDA Frances Young whether the Police Department had done a use-of-force investigation and report on the incident as the Department's policies required. DDA Young said she had not seen any such reports.  However, one of the body-cam videos produced by the prosecution showed a Police Department sergeant discussing preparation of an internal use-of-force report. Accordingly, the defense filed a motion to compel production of documents, relating to the use-of-force investigation.

183.     The unexplained absence of a use-of-force report from the prosecution's discovery production to the defense, caused the defense concern about whether the Police Department was providing to the prosecutor everything it was obligated to provide.

184.     Accordingly, the defense then took a series of steps to attempt to obtain the missing materials. It filed a motion to compel discovery production from the prosecution, specifically seeking use-of-force reports and related documents. It served subpoenas on the City Attorney's Office and the Police Department.  These requests sought all documents and communications related to the incident, any investigations thereof, and any communications within and among the Police Department, City Attorney's Office, and District Attorney's Office, about Mr. Toland, the incident, or the prosecution.

185.     The prosecutor filed a declaration with the Court which stated, *inter alia*, that she had been contacted by representatives of the City, who had asked her

not to agree to any misdemeanor disposition, because a felony conviction would, in their view, prevent Mr. Toland from being able to file a civil rights lawsuit.

186.     The Superior Court granted Mr. Toland's discovery motion, and ordered production of all the materials requested.  But the Department did *not* provide the materials to Ms. Young (as it should have done at the outset of the case).  Instead, on November 5, 2021, someone from the Police Department delivered to the Superior Court judge a flash drive containing numerous documents which had never been disclosed to the prosecutor or to the defense.  That flash drive contained, among other things, records showing that the City Attorney's Office had deliberately shut down the use-of-force investigation in order to prevent Mr. Toland from filing a civil suit (the email from Deputy City Attorney Mr. Nam, as noted, actually *said* this, explicitly) and that Officer McFarland had been the shooter in the Warren incident.

187.     When the City Attorney's Office found out that the judge had seen these materials, it desperately tried to keep the prosecution and defense from seeing them. Chief Deputy City Attorney Javan Rad appeared in court, for the first time.  He asserted that the flash drive had been "inadvertently produced" and that the City wanted it back.  The Court responded that the materials on the flash drive were directly responsive to both the subpoena and her discovery order, and that she had ordered them to be produced.

188.     The Court told Mr. Rad that the City lacked a legal basis for failing to comply with her order and expressed shock that these materials had not been disclosed to the prosecution prior to the preliminary hearing, so that the prosecutor could have met her constitutional obligations to produce them to the defense.

189.     Over the next three months, the materials remained undisclosed, while the City Attorney's Office requested repeated in camera hearings with the Court, and asserted multiple legal arguments to try to prevent production, all of which the

Court rejected. The defense conducted an evidentiary hearing with multiple Police Department officers, including Lieutenant Smith.  Ultimately, Lieutenant Smith testified, over Mr. Rad's efforts to silence her, and in contradiction of Mr. Rad's representations to the Court, that the key documents and communications were *not* attorney-client communications.

190.     Finally, on March 9, 2021, the City produced the documents to the prosecutor, DDA Young.  DDA Young immediately recognized them as *Brady*, and produced them to the defense.  Then, on April 22, 2021, DDA Young dismissed all the assault charges against Mr. Toland, stating on the record that the District Attorney's Office—including herself and the two supervisors above her— had concluded that these materials made it impossible to pursue the charges.

191.     Mr. Toland suffered psychological, emotional, physical, reputational, and economic harms as a result of the wrongful conduct set forth herein, in an amount according to proof at trial and in excess of $1 million. Inter alia, he was beaten up and suffered physical injuries; he experienced emotional, psychological and reputational harms from being wrongly accused of a serious felony; and he experienced economic harms from being forced to expend resources to defend himself.

192.     The Superior Court expressed its outrage at what the City did.  The Superior Court explained that this sort of conduct undermines public trust in the courts and in law enforcement, and violates the basic principles of honesty and fairness that ought to be the foundation of our justice system.  The Court expressed its hope that the City's actions would be "investigated at the highest levels" by the District Attorney's Office, and that what happened to Mr. Toland should "never, ever happen again."

193.     The Court, January 21, 2021: "I think it is inexcusable what happened in this case.  I think it is outrageous that there is information pertaining to a use of

force investigation that was shut down – And I don't believe for one minute that was an inadvertent disclosure, by the way, but I'm not going to go there. But this information bears on the credibility of these officers. And that is, in my mind, potential *Brady* information…

194.     The Court, January 21, 2021: "What I see now is that the City has interfered – interjected itself in the way the Pasadena Police Department should handle discovery. And that is troubling. That is very troubling."

195.     The Court, March 24, 2021:  "But I think it's fairly obvious that what happened in this case must never happen again.  And I think Ms. Young understands the responsibility that her office has to make sure it never happens again.  And I trust that the DA's office will deal with this at the highest levels of management in that office.  Because to allow a police agency to withhold evidence on the advice on counsel is a problem bigger than what we just see in this case."

196.     The Court, April 22, 2021: "But I wanted to be sure that what happened here never happens again."

197.     The prosecutor, April 22, 2021: "Because the Police Department relies on their attorney, as they have the right to do.  They do, however, assume that the City Attorney acts in their best interest.  They, unfortunately, were very shocked to discover that that was not the case."

198.     The prosecutor, April 22, 2021: "I have put them on notice.  And I look forward to seeing what happens from here on out."

199.     The Court, April 22, 2021: "I have never come across a case where a City Attorney or any other lawyer is getting involved in the discovery decisions made by the police agency where the police agency, based on that advice, doesn't disclose to the People relevant and material information about the case.  And that is something I can't—you know, I can't get—that's not my role.  But I am asking the DA's office here not just to watch, but to keep in mind that what happened here

was, yes, the City Attorney getting involved in information to be disclosed to the People. So if this is a one-off, you know, maybe it is. But my fear and my concern is that what happened here was pretty egregious."

200.     The Court, April 22, 2021: "But I am just really concerned that if the administration of the Police Department doesn't want anything to do with it, I really want to just caution the People that it really could impact the integrity of all prosecutions because we only fortuitously found this out."

201.     Mr. Toland agrees with the Court. What happened to him was troubling, egregious, and outrageous, and undermines public trust in the integrity of our criminal justice system. He hopes and prays that it never happens again. And by this lawsuit, he hopes to help make sure that it never does.

## CLAIMS FOR RELIEF
## FIRST CLAIM FOR RELIEF
**Excessive Force, in Violation of the Fourth Amendment to the Constitution of the United States, and 42 U.S.C. § 1983**
**(Against Defendants McFarland and Lack)**

202.     Mr. Toland realleges and incorporates by reference each foregoing and subsequent paragraph in this Complaint as though fully set forth herein.

203.     This claim for relief is brought pursuant to 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the United States Constitution.

204.      Defendants McFarland and Lack beat, choked, and Tased Mr. Toland severely and repeatedly, without justification or legal basis, and contrary to governing policy and clearly established law.

205.      As set forth above, Defendants did, *inter alia*, the following:

206.      Officer McFarland punched Mr. Toland in the face, at a time when Mr. Toland was not attacking or threatening anyone (as set forth herein, Mr. Toland never attacked or threated anyone).

207.      Officer McFarland threw Mr. Toland to the ground at a time when Mr. Toland was not attacking or threatening anyone (as set forth herein, Mr. Toland never attacked or threated anyone).

208.      Officer McFarland Tased Mr. Toland at least twice at a time when Mr. Toland was not attacking or threatening anyone (as set forth herein, Mr. Toland never attacked or threatened anyone).

209.      Officer McFarland punched Mr. Toland between 10 and 20 times in the head at a time when Mr. Toland was not attacking or threatening anyone (as set forth herein, Mr. Toland never attacked or threated anyone).

210.      Officer McFarland put his arm around Mr. Toland's neck from behind, and attempted to choke Mr. Toland into unconsciousness by cutting off blood flow to Mr. Toland's brain, at a time when Mr. Toland was seated on the ground, and not attacking, or threatening anyone (as set forth herein, Mr. Toland never attacked or threated anyone).

211.      Officer Lack put her arm around Mr. Toland's neck from behind, and attempted to choke Mr. Toland into unconsciousness by cutting off blood flow to Mr. Toland's brain, at a time when Mr. Toland was seated on the ground, and not attacking, or threatening anyone (as set forth herein, Mr. Toland never attacked or threated anyone).

212.      The reason she and Officer McFarland her arm around Mr. Toland's neck from behind, and attempted to choke Mr. Toland into unconsciousness by cutting off blood flow to Mr. Toland's brain, at a time when Mr. Toland was seated on the ground, and not attacking, or threatening anyone, was that Mr. Toland had remained seated on the ground rather than lie down immediately on his stomach.

213.     Employing a chokehold, "carotid control hold," or any technique that involves making contact with a person's neck, whether grabbing, squeezing, pressuring, or "arm-barring," with the purpose of rendering the person unconscious by cutting off blood flow to the brain, is, and was on the date of the incident, a clearly established violation of the Fourth Amendment, when the person is sitting on the ground and not attacking or threatening anyone.

214.     That constitutional rule is clearly established.  Defendants McFarland and Lack were on actual and constructive notice of it, and deliberately violated it, with the specific intent to harm Mr. Toland, viz., to cut off blood flow to his brain and render him unconscious.  Their decision to do so knowing that doing so violated clearly established constitutional law on the use of force is reprehensible and malicious and warrants imposition of punitive damages.

215.     Mr. Toland was damaged by and as a direct and proximate result of Defendants' unlawful conduct, as set forth herein.

216.     There is and was no ambiguity about the law in this area, and thus no possible legally colorable qualified immunity argument. In the United States of America, it is unconstitutional to apply a chokehold to a man sitting in his driveway not touching, attacking, or threatening anyone, because he fails to comply with a verbal command to lie on his stomach.[8]

---

[8] *See, e.g.*, *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1093 (9th Cir. 2013) ("The [Fourth Amendment] right to be free from the application of non-trivial force for engaging in mere passive resistance was clearly established prior to 2008.") *Tuuamalemalo v. Greene*, 946 F.3d 471, 477 (9th Cir. 2019) ("There is a robust consensus among the circuits that the use of a chokehold on a non-resisting person violates the Fourth Amendment.").

## SECOND CLAIM FOR RELIEF

### (Unreasonable Seizure of Person in Violation of the Fourth Amendment to the Constitution of the United States and 42 U.S.C. § 1983) (Against Officers McFarland and Lack)

217.   Mr. Toland re-alleges and incorporates by reference all preceding and succeeding paragraphs as though fully set forth herein.

218.   Defendants, acting under color of state law, used their official position, status, and authority as Pasadena Police Department officers, deliberately made false statements to other officers, as set forth herein, claiming that Mr. Toland had "attacked" Officer McFarland, to procure Mr. Toland's arrest without probable cause.

219.  By procuring Mr. Toland's arrest based on false and baseless accusations, and knowing that the accusations were based on fabrications, Defendants violated Mr. Toland's Fourth Amendment right to be free from unreasonable seizure of his person.

220.  Officer Lack claimed in her report the night of the incident that Mr. Toland "violently attacked" Officer McFarland.  She knew that that statement was not true, and that in fact she never saw any such thing.

221.   Officer McFarland claimed, in his statements to Officer Torres, that Mr. Toland jumped out the car, got behind him, put his arm around his neck, and choked him for five seconds until he felt himself blacking out.  He knew that that statement was not true.

222.  It is a violation of the Fourth Amendment for a police officer to deliberately make a false statement accusing a person of a crime, including by claiming to have witnessed an event that the police officer in fact did not witness.

223.  As a direct and proximate result of Defendants' actions, Mr. Toland was wrongfully seized, arrested, and detained, and suffered damages as alleged herein.

224.  It is a clearly established constitutional rule that police officers may not lie or make false accusations in their reports and testimony.  That constitutional rule is clearly established.  Defendants McFarland and Lack were on actual and constructive notice of it, and deliberately violated it, with the specific intent to harm Mr. Toland, viz., to procure his arrest and prosecution for "violently assaulting" Officer McFarland—something that Officer Lack admitted under oath did not occur.  Their decision to do so knowing that doing so violated clearly established constitutional law on the use of force is reprehensible and malicious and warrants imposition of punitive damages.

## THIRD CLAIM FOR RELIEF

**(Unreasonable Seizure of Person in Violation of the Fourth Amendment to the Constitution of the United States and 42 U.S.C. § 1983)**
**(Against Defendant Officer McFarland)**

225.     Officer McFarland seized Mr. Toland without reasonable suspicion or probable cause.

226.     Officer McFarland's traffic stop was a detention requiring an adequate legal justification under the Fourth Amendment.

227.     Officer McFarland claimed that he pulled over Mr. Toland because Mr. Toland's brake lights were malfunctioning.

228.     That claim was false.  The video evidence proves that Mr. Toland's brake lights were functioning normally, and that Officer McFarland saw them functioning normally.

229.     Officer McFarland's post-hoc claim that he was able to see a twentieth-of-a-second "delay" in the illumination of the right brake light compared to the left and center brake lights was false.

230.     Officer McFarland's post-hoc claim that he was able to see a twentieth-of-a-second "delay" in the illumination of the right brake light compared

to the left and center brake lights could not have created a legal justification for the stop in any event.

231.     Officer McFarland's detention of Mr. Toland was unconstitutional, and harmed by Officer McFarland's unconstitutional conduct, because but for the unconstitutional initial detention, Mr. Toland would not have been beaten, Tased, and choked by Officers McFarland and Lack, and would not have been wrongfully arrested and charged.

## FOURTH CLAIM FOR RELIEF

**(Deliberate Fabrication of Evidence in Violation of the Fourteenth Amendment and 42 U.S.C. § 1983)**
**(Against Defendants Officer McFarland and Officer Lack)**

232.     Officer McFarland acting under color of law, deliberately deprived Mr. Toland of his rights under the Constitution when he fabricated false allegations against Mr. Toland that were used to criminally charge and prosecute Mr. Toland. Officer McFarland falsely claimed that Mr. Toland attacked him, choked him, and pinned him to the ground.  These statements were deliberate fabrications.

233.     Officer McFarland presented false evidence to the prosecutor and that false evidence led to Mr. Toland being charged.  Therefore, the filing of the charges does not protect Officer McFarland from liability for his false statements. *See, e.g., Caldwell v. City & Cty. of San Francisco*, 889 F.3d 1105, 1115 (9th Cir. 2018) (where an officer presents false evidence to the prosecutor, the filing of charges does not provide any immunity to the officer, and "the analysis reverts back to a normal causation question"); Ninth Circuit Jury Instruction 9.2, "Deliberate Fabrication" Comment.

234.     Officer Lack, acting under color of law, deliberately deprived Mr. Toland of his rights under the Constitution when she fabricated false allegations against Mr. Toland that were used to criminally charge and prosecute Mr. Toland.

Officer Lack falsely claimed in her written report that Mr. Toland violently attacked Officer McFarland.  That statement was false.  Officer Lack knew it was false.  Officer Lack admitted in her sworn testimony at the preliminary hearing that that statement was false, and that in fact Mr. Toland never attacked Officer McFarland.

235.     Officer Lack presented false evidence to the prosecutor, and that false evidence led to Mr. Toland being charged.  Therefore, the filing of the charges does not protect Officer Lack from liability for her false statements.  *See*, *e.g.*, *Caldwell v. City & Cty. of San Francisco*, 889 F.3d 1105, 1115 (9th Cir. 2018) (where an officer presents false evidence to the prosecutor, the filing of charges does not provide any immunity to the officer, and "the analysis reverts back to a normal causation question"); Ninth Circuit Jury Instruction 9.2, "Deliberate Fabrication" Comment.

236.     It is a clearly established constitutional rule that police officers may not lie or make false accusations in their reports and testimony.  That constitutional rule is clearly established.  Defendants McFarland and Lack were on actual and constructive notice of it, and deliberately violated it, with the specific intent to harm Mr. Toland, viz., to procure his arrest and prosecution for "violently assaulting" Officer McFarland—something that Officer Lack admitted under oath did not occur.  Their decision to do so knowing that doing so violated clearly established constitutional law on the use of force is reprehensible and malicious and warrants imposition of punitive damages.

237.     Mr. Toland was harmed by Officer McFarland's and Officer Lack's deliberate fabrication of evidence.  He suffered psychological, emotional, and reputational harms in an amount subject to proof at trial, through being forced to spend close to two years with a serious felony charge hanging over him, knowing

that he was innocent; he suffered economic harms in an amount subject to proof at trial, through legal fees and time he was unable to devote to his business.

## FIFTH CLAIM FOR RELIEF

**(Deliberate or Reckless Suppression of Evidence in Violation of the
Fourteenth Amendment and 42 U.S.C. § 1983)
(Against Defendants City Attorney's Office and Nam)**

238.   The Pasadena City Attorney's Office, and Deputy City Attorney John Nam, deprived Mr. Toland of his constitutional rights by deliberately and recklessly suppressing exculpatory evidence.  Defendants acted deliberately, and pursuant to a deliberate policy of the City Attorney's Office, to intervene in the criminal discovery process to prevent the Police Department from turning over material favorable to Mr. Toland to the District Attorney's Office, so that that evidence would never see the light of day, would be suppressed from and unknown to the prosecutor, the defense, and the court in Mr. Toland's criminal case.

239.   Defendants did so with the deliberate and express intention of impairing and undermining Mr. Toland's right and ability to file a civil rights lawsuits.  The City Attorney's Office acted in accordance with its policy and practice, and with the knowledge, acquiescence, and ratification of the relevant policymaker, so as to subject it to direct civil liability under *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978).

240.   Defendants deliberately and recklessly suppressed from both the prosecution and defense—and the Court—the evidence that Officer McFarland had shot and killed Daniel Warren on May 17, 2019, only four weeks before he beat Mr. Toland.

241.   Defendants were deliberately indifferent to Mr. Toland's constitutional rights to due process and a fair trial.  Defendants did not care if Mr. Toland were wrongfully convicted, so long as they could save the City money by

avoiding a civil rights lawsuit for excessive force.

242.　　Defendants actively hoped and intended that Mr. Toland would be convicted while never knowing about the suppressed impeachment materials.

243.　　It is a clearly established constitutional rule that government officials, including attorneys, may not suppress exculpatory evidence.  That constitutional rule has been clearly established for more than forty years.  Defendants Nam and the City Attorney's Office were on actual and constructive notice of it, and deliberately violated it, with the specific intent to harm Mr. Toland, viz., to procure his prosecution and conviction for "violently assaulting" Officer McFarland, by preventing him from obtaining evidence that could have—and in fact ultimately *did*—result in the charges being dismissed.

244.　　Defendants' deliberate decision to attempt to procure Mr. Toland's conviction by burying exculpatory evidence and preventing the defense, the prosecution, or the Court from seeing it is reprehensible, malicious, outrageous, and contrary to the ethical principles that govern the profession of law, and warrants imposition of punitive damages.

## SIXTH CLAIM FOR RELIEF

### (Conspiracy to Suppress Evidence in Violation of the Fourteenth Amendment and 42 U.S.C. § 1983)
### (Against Defendants City Attorney's Office and Nam)

245.　　The Pasadena City Attorney's Office, and Deputy City Attorney John Nam, conspired to deprive Mr. Toland of his constitutional rights by deliberately and recklessly suppressing exculpatory evidence.  Defendants conspired with other attorneys at the City Attorney's Office, and followed a deliberate policy of the City Attorney's Office to intervene in the criminal discovery process to prevent the Police Department from turning over material favorable to Mr. Toland to the District Attorney's Office, so that that evidence would never see the light of day,

would be suppressed from and unknown to the prosecutor, the defense, and the court in Mr. Toland's criminal case.

246.    Defendants did so with the deliberate and express intention of impairing and undermining Mr. Toland's right and ability to file a civil rights lawsuits. The City Attorney's Office acted in accordance with its policy and practice, and with the knowledge, acquiescence, and ratification of the relevant policymaker, so as to subject it to direct civil liability under *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978).

247.    Defendants deliberately and recklessly suppressed from the prosecution, the defense, and the Court—the evidence that Officer McFarland had shot and killed Daniel Warren on May 17, 2019, four weeks before he beat Mr. Toland.

248.    Defendants were deliberately indifferent to Mr. Toland's constitutional rights to due process and a fair trial.  Defendants did not care if Mr. Toland were wrongfully convicted, so long as they could save the City money by avoiding a civil rights lawsuit for excessive force.

249.    Defendants actively hoped and intended that Mr. Toland would be convicted while never knowing about the suppressed impeachment materials.

250.    Defendants' deliberate decision to attempt to procure Mr. Toland's conviction by burying exculpatory evidence and preventing the defense, the prosecution, or the Court from seeing it is reprehensible, malicious, outrageous, and contrary to the ethical principles that govern the profession of law, and warrants imposition of punitive damages.

## SEVENTH CLAIM FOR RELIEF

### (Injunctive Relief)
### (Against Defendant City Attorney's Office)

251.    Mr. Toland prays that the Court enter a permanent injunction against

the City Attorney's Office prohibiting it and all attorneys, agents, and employees acting through and with its powers and authority, from interfering in production of evidence by the Police Department to the District Attorney's Office in criminal prosecutions.

252.     Specifically, Mr. Toland prays that the Court enjoin the City Attorney's Office from ever again directing or advising the Police Department to withhold any evidence or information from the District Attorney's Office during the discovery process in a criminal prosecution.

253.     Additionally, Mr. Toland prays that the Court enjoin the City Attorney's Office from ever again directing or advising the Police Department to refrain from conducting an internal investigation into its officers' use of force for the purpose of preventing a civil rights lawsuit by a citizen; or from directing or advising the Police Department to delay such an investigation until after the statute of limitations for a civil rights lawsuit has run out.

254.     Such an injunction is necessary because of the outrageous and egregious conduct alleged herein, in which the City Attorney's Office deliberately attempted to undermine Mr. Toland's rights under the federal Constitution and federal law, including inter alia his rights under the Fifth, Sixth, and Fourteenth Amendments, and under 42 U.S.C. § 1983.

255.     Such an injunction is a proper exercise of this Court's powers.  When a court identifies a right and a violation of that right by state actors, the district court's equitable powers are broad and flexible, and encompasses the power to create relief that addresses each element contributing to the violation.  A court may fashion an injunction to compel defendants to take certain steps to ensure compliance with constitutional mandates.  Such injunctions against local governments to remedy constitutional and statutory violations are proper and

necessary in order to uphold constitutional and statutory rights.[9]

256.    When state actors deliberately attempt to subvert federal law and federal rights, a federal-court injunction is the appropriate remedy.  It is necessary here to ensure, as the Superior Court said: "This must never happen again."

## PRAYER FOR RELIEF

Mr. Toland prays for relief as follows:

1.  Compensatory, general and special damages against all Defendants in an amount to be proven at trial.

2.  Costs, expenses and attorneys' fees pursuant to 42 U.S.C. section 1988 and as otherwise authorized by law.

3.  Punitive damages against Defendants in an amount appropriate to punish them and to deter others from engaging in similar misconduct.

4.  Injunctive relief as requested herein, in the form of a permanent injunction forbidding the City Attorney's Office from directing or advising the Police Department to withhold any materials from the District Attorney's Office in any criminal case.

5.  Such other relief as the Court may deem proper.

DATED:  June 10, 2021                Respectfully submitted,

                                      WERKSMAN JACKSON & QUINN, LLP

                                      CALEB E. MASON
                                      JACQUELINE M. SPARAGNA
                                      Attorneys for Plaintiff
                                      Jeffrey Toland

---

[9] *See, e.g.*, *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 5 (1972); *Hutto v. Finney*, 437 U.S. 678, 687 (1978), *Lemon v. Kurtzman*, 411 U.S. 192, 200 (1973); LA *Alliance for Human Rights, et al. v. City of Los Angeles*, No. 2:20-cv-2291-DOC, ECF Doc. 277 (Order), pp. 95-104.

## **DEMAND FOR JURY TRIAL**

Mr. Toland demands a jury trial.

DATED:  June 10, 2021                    Respectfully submitted,

WERKSMAN JACKSON & QUINN, LLP

CALEB E. MASON
JACQUELINE M. SPARAGNA
Attorneys for Plaintiff
Jeffrey Toland