Caleb E. Mason (State Bar No. 246653)
Jacqueline M. Sparagna (State Bar No. 315275)
WERKSMAN JACKSON & QUINN LLP
888 West Sixth Street, Fourth Floor
Los Angeles, California 90017
(213) 688-0460
cmason@werksmanjackson.com
Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFREY TOLAND,<br><br>       Plaintiff,<br><br>v.<br><br>ZACHARY MCFARLAND, in his individual and official capacity; STEPHANIE LACK, in her individual and official capacity; CITY OF PASADENA; and DOES 1-10, inclusive,<br><br>       Defendants. | **FIRST AMENDED COMPLAINT FOR:**<br><br>1. **Deprivation of Civil Rights in Violation of 42 U.S.C. § 1983 (Excessive Force)**<br><br>2. **Deprivation of Civil Rights in Violation of 42 U.S.C. § 1983 (Unreasonable Seizure—Procurement of Arrest by False Statements)**<br><br>3. **Deprivation of Civil Rights in Violation of 42 U.S.C. § 1983—Detention Without Reasonable Suspicion**<br><br>4. **Deprivation of Civil Rights in Violation of 42 U.S.C. § 1983—Deliberate Fabrication of Evidence**<br><br>5. **Deprivation of Civil Rights in Violation Of 42 U.S.C. § 1983—Suppression of Exculpatory Evidence**<br><br>6. **Conspiracy to Engage in Deprivation of Civil Rights in Violation Of 42 U.S.C. § 1983—Suppression of Exculpatory Evidence**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

Plaintiff Jeffrey Toland ("Mr. Toland") files his First Amended Complaint ("FAC") and alleges as follows:[1]

## I.   **INTRODUCTION**

1.   This lawsuit alleges that a Pasadena Police Department officer, Zachary McFarland, pulled over Mr. Toland without legal justification, then severely beat Mr. Toland in his own driveway in front of his wife and daughter, punching, Tasing, and choking Mr. Toland while Mr. Toland sat on the ground.  Another officer, Stephanie Lack, joined in the beating, also applying a chokehold that constituted excessive force as a matter of law.

2.   Both officers then lied about the incident, in their statements and written reports, falsely stating that Mr. Toland had leaped out of the car and attacked Officer McFarland, knocking him to the ground.  Because of their false statements, Mr. Toland was arrested and charged with assaulting a police officer.

3.   The City of Pasadena was concerned about potential civil liability because Officer McFarland, a probationary officer who had only been at the Department for six months, had a troubling history of violence.  Only four weeks before beating Mr. Toland, Officer McFarland had shot and killed another Pasadena resident, Daniel Warren, in questionable circumstances.

4.   Mr. Toland's defense was that Officer McFarland had used excessive force and then made false statements about the incident—exactly what happened in the Warren shooting.  So the City determined to prevent Mr. Toland, or the Deputy District Attorney prosecuting Mr. Toland, or the Superior Court, from finding out that Officer McFarland had shot and killed Daniel Warren just four weeks before the Toland incident.

5.   The City, acting at the highest levels and in conspiracy with multiple City officials, deliberately suppressed that information and all reports relating to it—at

---

[1] Mr. Toland is mindful of the Court's admonition regarding the length of the Original Complaint.  The FAC has been shortened from 63 pages to 36 pages.

least 234 pages of reports and interviews.  The City told the Police Department not to produce these materials to the prosecution, and made false and misleading representations to the defense, the prosecution, and the Court about its possession of information relating to Officer McFarland, and whether all the discovery it was obligated to produce had in fact been produced.  For example, the City sent a letter to defense counsel stating that it had no records relating to any discharge of a firearm at a person by Officer McFarland, or any use of force by Officer McFarland that caused great bodily injury or death; and when the City presented Officer McFarland's files to the Court for review following the granting of Mr. Toland's Pitchess motion, the City withheld all materials (at least 234 of reports in its possession) regarding Officer McFarland's shooting and killing of Daniel Warren.  The City's objective was for Mr. Toland to be tried and convicted without ever learning about the Warren shooting.

6.  However, a whistleblower inside the Police Department sent a flash drive to the Superior Court judge containing the files relating to Officer McFarland and the Warren shooting.  When the City found out, it sent its Chief Deputy City Attorney to demand that the Court return the materials, but the Court ruled that the materials were relevant evidence and turned them over to the prosecutor.  The prosecutor immediately recognized them as Brady evidence and turned them over to the defense, and then dismissed the assault charges against Mr. Toland.

7.  The attempt by a City to attempt to obtain a conviction of one of its own citizens by interfering in the criminal discovery process to suppress relevant exculpatory evidence is extremely disturbing constitutional misconduct.  As the Superior Court noted, the City's actions undermine confidence in the entire criminal justice system.

8.  Mr. Toland brings this lawsuit to hold the City to account, and ensure that what happened to him never happens to anyone else.

## II.   JURISDICTION, PARTIES AND VENUE

9.   The claims alleged herein arise under the Constitution and laws of the United States, giving this court jurisdiction under 28 USC § 1331. This Court has subject-matter jurisdiction over this action because the case arises under the Fourth and Fourteenth Amendments to the United States Constitution, and under Title 42 §§ 1983 *et seq*. of the Unites States Code.

10. Any additional claims arising from the acts and omissions herein alleged are supplemental as that term is interpreted for the purposes of 28 USC §1367.

11. Venue is proper in this Court because Mr. Toland and the Defendants reside in this District. Further, all or a substantial part of the events or omissions giving rise to the claims for relief occurred in this District.

12.  Mr. Toland is 58 years old.  He lives in Pasadena, in Los Angeles County, California, within the Central District of California.

13.  Defendant Zachary McFarland ("Officer McFarland") was, at all relevant times, an officer with the Pasadena Police Department. He committed the acts at issue herein during the course and scope of his employment with the Pasadena Police Department, within the Central District of California.  He is sued in his individual and official capacities.

14.  Defendant Stephanie Lack ("Officer Lack") was, at all relevant times, an officer with the Pasadena Police Department. She committed the acts at issue herein during the course and scope of her employment with the Pasadena Police Department, within the Central District of California.  She is sued in her individual and official capacities.

15. Defendant City of Pasadena ("City") is a municipality, of which the City Attorney's Office and Police Department are agencies.  As set forth herein, it is properly sued under *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978) because it committed the acts at issue herein pursuant to a policy,

custom, and practice, and with the direction and ratification of relevant policymakers.

16.     Mr. Toland is ignorant of the true names and capacities of defendants sued herein as Does 1 through 10, inclusive, and therefore sues said defendants by fictitious names.  Mr. Toland will amend this complaint to allege their true names and capacities when they are ascertained.

17.  Mr. Toland is informed and believes and therefore alleges that each of the fictitiously named defendants was responsible in some manner for the occurrences herein alleged, including without limitation aiding and abetting the wrongful acts of Defendants as set forth herein, and that Mr. Toland's injuries as herein alleged were proximately caused by said Defendants.

18.  Mr. Toland is informed and believes and therefore alleges that Defendants were the agents of their co-defendants and in doing the acts herein alleged were acting within the scope of such agency and with the permission of their co-defendants.

### III.   STATEMENT OF FACTS

### A. May 17, 2019: Officer McFarland Kills Daniel Warren

19.     Pasadena resident Daniel Warren suffered from mental illness. On May 17, 2019, he was standing on the sidewalk, holding a pistol and shouting incoherently.  Neighbors called 911 and multiple officers responded. When officers arrived, no one was near Mr. Warren. Officer McFarland and four other officers took positions at least one hundred feet away, across the street and at the end of the block, behind a hedge, a wall, and a telephone pole.  Video taken at the scene raises the distinct possibility that Mr. Warren, who was standing on the sidewalk talking incoherently to himself, may not have even been aware that the police had arrived.

20.  Body-worn cameras recorded Officer McFarland saying that Mr. Warren was pointing his gun at the officers.  None of the other officers at the scene made

any such statements at the time, though they were all standing next to each other and all looking at Mr. Warren.  The senior officer on scene instructed the officers to "keep giving him commands," and talk to him to try to de-escalate the situation. The other officers remained calm and followed the sergeant's instructions.  Officer McFarland, though, can be heard on his body-worn camera responding under his breath to the sergeant's "Keep giving him commands" directive as follows: "I'm going to take him out." McFarland then takes careful aim with his rifle and shoots Mr. Warren from a hundred feet away, from behind a telephone pole.

21.  The Sheriff's Department interviewed Officer McFarland.  Officer McFarland gave a false response to the question of how many shots he'd fired. He said variously one, two, or three shots—but eight rounds were missing from his magazine.  He claimed that Mr. Warren had clearly pointed the pistol at him twice, but review of the body-worn footage shows that none of the other officers, who were all looking at the exact same scene, gave any indication that they saw Mr. Warren pointing the gun at them.

22.  The Department did not publicly identify Officer McFarland as the shooter, nor did the Department put Officer McFarland on leave.  Then, a month later, he beat another Pasadena citizen, Mr. Toland.

**B. June 21, 2019: Officers McFarland and Lack Beat and Choke Mr. Toland, and then Lie About It**

23.  At approximately 10:10 p.m. on June 21, 2019, Mr. Toland was driving his teenage daughter home from a friend's house. Approximately one mile from the Toland family's home, at the intersection of St. John Avenue and Del Mar Boulevard, Mr. Toland turned right onto Del Mar.

24.  Defendant Zachary McFarland ("Officer McFarland"), a 26-year-old probationary Pasadena police officer, who had been employed by the Pasadena Police Department for less than a year, was on patrol in the area.  He was about 200 to 300 feet away from Mr. Toland's vehicle when Mr. Toland made the turn.

25.  Officer McFarland decided to follow Mr. Toland.  The reasons for his decision remain unclear.  Mr. Toland did not violate any traffic laws, and was never given a traffic ticket.

26.  Officer McFarland later claimed that Mr. Toland's brake lights "were not working properly."  But dashboard video from Officer McFarland's vehicle proved his statement to be false, because it shows both brake lights to be working:



27.  When confronted at the preliminary hearing with the above video, clearly showing the brake lights working normally, Officer McFarland claimed that although in real time, to the naked eye, they appeared to be working normally, when the video was slowed down and viewed frame by frame, the right rear brake light illuminates approximately one frame (or one twentieth of a second) after the center and left brake lights.

28. Officer McFarland claimed at the preliminary hearing, for the first time, that he had actually seen that twentieth-of-a-second delay, and that it was the reason for the traffic stop.  He also claimed that such a twentieth-of-a-second delay constituted a violation of California motor vehicle laws.

29.  Officer McFarland's claim was false as a matter of fact and baseless as a matter of law.[2]

30.  After following Mr. Toland for around a minute, Officer McFarland activated his overhead lights.  Mr. Toland, who was only about 100 yards from home and was traveling slowly, turned on his right-hand turn indicator and reached his arm out his window, waving and pointing to his right to indicate where he was going.  He came to a stop 27 seconds after Officer McFarland activated his lights.

31.  Officer McFarland pulled up on the street behind Mr. Toland's driveway, got out, walked up to the driver's door, which was open.  As he walked up the driveway, Mr. Toland smiled and turned to get out of the car.

32.  Officer McFarland put his hand on Mr. Toland's shoulder and roughly pushed him back into the car, saying "Stay in the car.  Stay in the car."

33. The following image is from Officer McFarland's body camera, and shows him pushing Mr. Toland:



34.  Officer McFarland requested Mr. Toland's driver's license and other documents.  Mr. Toland provided his insurance card and stated calmly that he

---

[2] Officer McFarland knew, and should have known, that there is nothing in the California Vehicle Code that suggests that one brake light illuminating a twentieth of a second after another light is a violation of any kind.

would need to go inside to get his license.  Officer McFarland refused to let him go inside, again ordering him to stay in the car.

35.  Officer McFarland then said: "When the red lights come on, state law says you have to pull over."  Mr. Toland asked what he was being pulled over for.  He asked four times before Officer McFarland answered.

36.  First, Mr. Toland asked "Has there been a breach of the peace?"  Officer McFarland responded "Yes, there has been.  You have a vehicle code violation on your car and that's why I'm pulling you over."  Mr. Toland then asked two more times what that violation was.  Officer McFarland refused to answer, responding instead each time: "What's your last name?"  Mr. Toland then began asking again and Officer McFarland interrupted him, again not answering the question, saying, "You are being detained for a traffic code violation."  "Which is what?" Mr. Toland asked.

37. It appears from the video that Officer McFarland was trying to think of something to say to justify the stop.  Finally, after the fourth request from Mr. Toland, he responded "Your brake light is not working properly."

38.  Officer McFarland then asked Mr. Toland's name, and Mr. Toland told him. "My name is Jeff Toland."

39.  Officer McFarland then berated Mr. Toland for not stopping immediately.

40.  Mr. Toland, sensing Officer McFarland's tone and increasing agitation, and hoping to de-escalate the situation, tried to placate Officer McFarland, saying: "I respect what you're doing, you know, because you're out here, you know, taking care of whatever you have to take care of.  You know, so I do respect that, but I haven't done anything."

41. Officer McFarland responded: "You've committed a Vehicle Code violation which is grounds for me to stop you."  He then said, again, "Tell me your last name," which Mr. Toland had already told him.  Mr. Toland did so again, spelling it out and gave Officer McFarland his date of birth and address.  After calmly

providing that information, Mr. Toland asked again "What was the reason for pulling me over?"  Officer McFarland refused to answer: "I already explained that to you, sir."  Mr. Toland was confused because he knew that his brake lights were working normally.  At this point Mr. Toland asked his daughter if she wanted to go inside.  Officer McFarland said sarcastically: "Is this your daughter? Are you setting a good example right now for your daughter?"

42.  Officer McFarland stood over Mr. Toland in the open driver's door during this entire interaction, mere inches from him, shining his flashlight directly into Mr. Toland's eyes, causing Mr. Toland to flinch and try to shield his eyes.



43. At this point Defendant Stephanie Lack, another Pasadena Police Department officer, walked up the driveway to provide assistance.  Officer McFarland gestured toward Mr. Toland and said "Extremely un-co-op."  (Mr. Toland, as the video confirms, had done nothing uncooperative.)

44. Officer McFarland and Officer Lack then asked Mr. Toland more questions about the car—but still would not let him go into the house to get his wallet. Officer McFarland then ordered Mr. Toland to get out of the car, while still standing mere inches from him in the open driver's side doorway, blocking his exit.

45. Mr. Toland obeyed the command and leaned forward to step out of the car. Officer McFarland simultaneously reached down and grabbed Mr. Toland's left arm and pulled on it, despite Mr. Toland being in the act of complying with the command.

46. Officer McFarland leaned back and twisted his body as he pulled on Mr. Toland's arm. This action was improper and contrary to applicable norms and best practices. Mr. Toland was attempting to comply as Officer McFarland pulled on him.

47. The proper conduct in this situation would have been for Officer McFarland to step back and give Mr. Toland room to exit the vehicle. Instead, Officer McFarland chose to grab Mr. Toland's arm while standing almost directly on top of him. As Officer McFarland did so, he lost his balance and stumbled sideways, while still holding Mr. Toland's left arm with his right hand.

48. Officer McFarland then yelled "Don't tense up on me!"

49. When describing the incident to other officers afterward, Officer McFarland lied. He told them that Mr. Toland had leaped out of the car, gotten behind him, and wrapped his arm around Officer McFarland's neck in an "arm bar," for five seconds, causing Officer McFarland to almost lose consciousness. This story was false, as demonstrated by video evidence, Officer Lack's sworn testimony, and Officer McFarland's own later admissions.

50. Officer McFarland immediately grew angry and violent. While facing Mr. Toland and not in contact with him, he deliberately and without warning punched Mr. Toland in the face—the very definition of a "sucker punch."

51. Officer McFarland then grabbed Mr. Toland around the waist and tackled him to the ground. He then punched Mr. Toland approximately a dozen times in the head. He then Tased him twice and, as Mr. Toland sat on the ground, stood behind Mr. Toland, putting his arm around Mr. Toland's throat and attempted to choke Mr. Toland into unconsciousness.

52.  Officer Lack joined Officer McFarland as he tried to choke Mr. Toland. She  put her arm around Mr. Toland's neck as well, and attempted to choke him into unconsciousness.

53.  Officer McFarland lied about why he did these things.  He told the other officers who responded that Mr. Toland had leaped out of the car, gotten behind him, and applied an "arm bar" around his neck for "five seconds," until he "felt himself losing consciousness."  That did not happen.

54.  Officer Lack made deliberately false statements as well.  She signed a report stating that she had seen Mr. Toland "violently attack" Officer McFarland. In fact, she later admitted that she never saw anything of the kind.  Under oath, her testimony was as follows:

Q: You also wrote in your report, didn't you, that "Mr. Toland violently attacked Officer McFarland as he was stepping out of the vehicle."  Is that what you wrote?
A: Yes.
…
Q: So Ma'am, isn't it true that, in fact, you did not witness Mr. Toland, quote, violently attack Officer McFarland as Mr. Toland was stepping out of the vehicle. You didn't see that, did you?
A: No.

Testimony of Officer Lack, Feb. 7, 2020, at 259:20-24, 261:6-10.

55.  On February 7, 2020, Officer Lack admitted, under oath, in open court, that she signed a false police report claiming to see an "attack" that she in fact never saw.

56.  As of the date of this Complaint, she has not been disciplined, fired, or charged (under Penal Code section 118.1 or any other statute) with making a false police report.

57.  Officer Lack—who was standing right next to Mr. Toland and Officer McFarland when Officer McFarland threw Mr. Toland to the ground—claimed she

had no idea how Mr. Toland ended up on the ground: "I do not know how it happened.  I was there, but I do not know how he went from standing to being on the ground." Testimony of Officer Lack, Feb. 7, 2020, at 248:21-249:13.  "Q: When it came to him moving from a standing position to being on the ground, you were about six inches away; correct? A: Correct.  Testimony of Officer Lack, Feb. 7, 2020, at 257:23-258:7. "Q: Do you have any memory in your head, as you sit here today, of the manner in which Mr. Toland came to go from a standing position to being on the ground? A: No."  Testimony of Officer Lack, Feb. 7, 2020, at 262:8-10.

58.  Officer Lack's testimony at the preliminary hearing that she had no memory of events that happened directly in front of her, three feet away, while she was watching, is neither true nor credible.  In fact, Officer Lack watched Officer McFarland punch Mr. Toland and push him to the ground, without justification.

59.  Officer Lack's body camera would have showed clearly what happened. But, as noted, the footage from Officer Lack's body-worn camera (hers alone out of the 17 officers involved with the case that evening) was never produced. Officer McFarland's body camera footage is blurry and indistinct during the time he was in contact with Mr. Toland.  Officer Lack was positioned approximately three feet away, facing Officer McFarland and Mr. Toland, so her camera footage would have captured everything.

60.  Officer McFarland made false statements at the preliminary hearing, claiming that Mr. Toland had assaulted him and that he was "extremely afraid for [his] life."  He claimed that as he tried to pull Mr. Toland out of the car "using my leverage in a twisting motion," Mr. Toland brought his right arm up to Officer McFarland's throat and "applied pressure" to it.  That testimony is false.  Officer Lack admitted under oath that she did not see any such thing.

61.  Officer McFarland also falsely claimed at the preliminary hearing that when he threw Mr. Toland to the ground, he fell under Mr. Toland and was pinned under him.  Testimony, Jan. 22, 2020, at 73:21-27.

62.  Officer McFarland's testimony was false and it was directly contradicted by Officer Lack's testimony.  Officer Lack—who was three feet away and watching—testified that Officer McFarland was never on the ground at all. Testimony, Feb. 7, 2020, at 10:-23.

63.  While Mr. Toland was seated on the driveway, neither saying nor doing anything threatening, and not in physical proximity to Officer Lack or Officer McFarland, both Officers placed their arms around Mr. Toland's throat and try to choke him into unconsciousness by cutting off the blood flow to his brain.  They did this as Mr. Toland was simply sitting still with his hands on the ground, saying "I didn't do anything." Their intent is confirmed by Officer Lack's testimony:

Q: It's an attempt to cut off blood flow to the brain to render the victim unconscious; right?
A: Correct.
Q: You were attempting to render him unconscious by squeezing your arm under his neck; correct?
A: Correct.

Testimony of Officer Lack, Feb. 7, 2020, at 267:18-23.

64.  The officers grabbed his throat, one from each side, and began choking Mr. Toland while he was seated on his driveway, with his hands on the ground, not touching anyone or saying or doing anything violent, but simply staying in a seated position.  Officer McFarland confirmed this:

Q: He's in a seated position, and you and Officer Lack are behind him; correct?
A: We're—I think Officer Lack might be behind him.  I'm on his left side, I believe.
Q: What you wanted him to do was lie down on his stomach?
A: Correct.

Testimony of Officer McFarland, Jan. 22, 2020, at 154:1-9.

65.  Because Mr. Toland remained seated, and did not lie down on his stomach, both officers reached around his neck and squeezed, attempting to cut off blood flow to his brain and render him unconscious.

Q: She used her arm, put it around Mr. Toland's neck, and squeezed?
A: Correct.
Q: You recognized that to be a carotid control hold?
A: I did.

…

Q: You subsequently also put your arm around Mr. Toland's throat and tried to squeeze with a carotid control choke hold; correct?
A: Correct.

Testimony of Officer McFarland, Jan. 22, 2020, at 154:25-155:12.

66.  Officer McFarland and Officer Lack violated clearly established law when they applied a chokehold to Mr. Toland as a response to "passive resistance," *viz.*, sitting still on his driveway.  Application of force to a person's neck to cut off blood flow—is deadly force.

67.  It is clearly established law that officers may not employ a chokehold to overcome passive resistance.  *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1093 (9th Cir. 2013).

68.  When Officer McFarland and Officer Lack grabbed him around the throat and tried to choke him into unconsciousness, Mr. Toland instinctively tried to save his life.  He reached up with both hands and grabbed hold of the officers' arms in a desperate attempt to keep his airway open and keep breathing.

69.  In response, Officer McFarland, while continuing to choke Mr. Toland with his right arm, punched Mr. Toland in the head and face between ten and twenty times with his left hand.  Officer McFarland also Tased Mr. Toland twice.

70.  Officer McFarland and Officer Lack could have killed Mr. Toland with the chokehold they were applying to his throat.

71.  Officer McFarland and Officer Lack then made false statements in their reports of the incident.

72.  In Officer McFarland's statement (which he dictated to Officer Torres, and did not sign, and which was subsequently significantly edited by others in the Department, without disclosure to the defense), he claimed that Mr. Toland had jumped out of the car, "maneuvered" behind him, and grabbed him around in an "arm bar" and choked him for "approximately 5 seconds" until he "felt himself blacking out."

73.  He later admitted that none of those things actually happened.

74. Officer Lack also testified that Mr. Toland did not in fact do anything violent:

Q: So, Ma'am, isn't it true that, in fact, you did not witness Mr. Toland, quote, violently attack Officer McFarland as Mr. Toland was stepping out of the vehicle.  You didn't see that, did you?
A: No.

Testimony of Officer Lack, Feb. 7, 2020, at 261:6-10.

75. Here is what Officer Lack actually saw:

Q: As far as what you saw, Mr. Toland was simply standing there with his hands at his sides; correct?
A: Yes.

Testimony of Officer Lack, Feb. 7, 2020, at 256:12-14.

76.  As a result of Officers McFarland and Lack's false statements, both on the night of the incident and at the preliminary hearing, Mr. Toland was arrested and charged with felony counts of battery against a police officer and resisting arrest.

77.  Officer McFarland and Officer Lack gave the testimony set forth above, under oath, in court, at the preliminary hearing on the charges brought against Mr. Toland in the presence of a Deputy District Attorney.

78.  Officer McFarland and Officer Lack committed the acts set forth above while on duty within the course and scope of their employment with the Pasadena Police Department.

79.  Mr. Toland was harmed by Officer McFarland's and Officer Lack's conduct.  He suffered significant physical, psychological, and emotional injuries subject to proof at trial, when Officer McFarland and Officer Lack tackled, punched, Tased, and choked him, which could easily have killed him and caused him to fear that he was about to be killed in front of his wife and young daughter.

80. Mr. Toland was harmed emotionally, psychologically, and economically by Officer McFarland's and Officer Lack's false statements because those false statements caused him to be arrested and criminally charged with assaulting a police officer, forcing him to defend himself for nearly two years before the charges were dismissed.

81.  Officer Lack had a professional, legal, and moral duty to inform her superiors the night of the incident that she never saw Mr. Toland do anything violent or attack anyone, and that Officer McFarland was never on the ground. She should have done her duty and told the truth at the outset.  Instead, she elected to protect Officer McFarland and sign her name to a report she knew to be false.

**C. The City Suppresses *Brady* Evidence Related to the Warren Killing**

82. Because of the Warren shooting and the Toland incident, the City was worried about facing civil liability for Officer McFarland's conduct.

83.  In addition, the City had made public statements about the Warren shooting—for example, that Mr. Warren had been holding an AR-15 assault rifle, had pointed it at officers, and that he had shot at officers, who had only returned fire "in an exchange of gunfire"—that were false.[3]

---

[3] See, e.g., https://abc7.com/pasadena-officer-involved-shooting/5517501/ (news story citing "police" for the factually incorrect assertions that Mr. Warren had been holding an AR-15 rifle, had pointed it and shot at officers, and that the officers returned fire).

84.  The City knew that the other officers next to Officer McFarland did not perceive a threat requiring deadly force, and didn't fire their weapons until after Officer McFarland did.  And the City knew that Officer McFarland had told investigators that he'd only shot twice, but when they looked at his gun, eight rounds had been fired.

85.  Additionally, after the Warren shooting, the Department did not place Officer McFarland on leave and did not conduct an investigation.  The Department left him on patrol.  And then, a month later, Officer McFarland beat up Mr. Toland.  Officer McFarland's conduct, and the City's conduct, with respect to both incidents, created a risk for the City of adverse publicity and civil liability.  Accordingly, it was important to the City that no one connected the dots between the Warren and Toland cases.  Thus, the City had to suppress, in the Toland case, all evidence relating to the Warren shooting.

86.  The City Attorney knew that the Police Department, if not prevented, might do its constitutional duty and provide the District Attorney in the Toland case with information about Officer McFarland, including the Warren shooting.  So the City Attorney intervened to stop that from happening, and make sure that prosecution, the Court, and the defense in the Toland case never found out about it.

87. The City Attorney instructed the Police Department not to tell the Deputy District Attorney assigned to the Toland case that Officer McFarland had been the shooter in the Warren case, despite the fact that Toland's express defense at his preliminary hearing was that Officer McFarland had used excessive force without justification and made false statements about the incident—*exactly* what he had done in the Warren shooting.  The City's goal was for Mr. Toland to be convicted without every learning about Officer McFarland's actions in the Warren shooting.

88. The judge expressed "outrage" that the information had been withheld, and the prosecutor produced the information to the defense immediately after it was

revealed (almost two years into the case), and then dismissed the assault charges against Mr. Toland because of it.

89. The office acted—with, by and through its employees and agents, including at least Defendant Deputy City Attorney John Nam, Chief Deputy City Attorney Javan Rad, and Deputy City Attorney Arnold Lee—in a conspiracy to deliberately deprive Mr. Toland of his constitutional right to exculpatory evidence and with the specific intent to procure his conviction of a felony offense.

90. These actions were conducted by the City Attorney's Office, pursuant to, as part of, in conformity with, and as ratified by, its practices and policies, and with the knowledge and approval of its policymaker.  The City Attorney's Office is therefore liable directly as a section 1983 defendant, under *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978).

91. In criminal prosecutions, the prosecutor has a constitutional and ethical obligation to produce all exculpatory material to the defense.  That obligation extends to all materials in the possession of the investigating agency, in this case the Police Department. The City Attorney's Office interfered in the discovery process, directing the Police Department not to share numerous exculpatory documents with the prosecution so that the prosecution would not be able to provide them to the defense.

92.  The City's goal was to prevent Mr. Toland from finding out about Officer McFarland's history, and to secure felony conviction of Mr. Toland while keeping Officer McFarland's history  secret.  Its attempt to do so violated the Constitution.

**D. The Defense's Multiple Attempts to Obtain Discovery**

93.  The defense pursued all legal discovery avenues, as summarized below.

**Discovery Request under Penal Code § 1054.1**

94. On August 7, 2019, the defense made a formal discovery request under Penal Code section 1054.1, which included "all information, no matter how or if recorded, of prior acts adversely reflecting on honesty… of any witnesses,

including police officers, to be called to testify against the defendant," and "any evidence, information, documents or other materials favorable to the defendant in the possession of… any police department involved in the investigation of the case against the defendant."

95.  The DDA repeatedly assured the defense and the Court, at multiple hearings both before and after the preliminary hearing, that all such evidence had been produced.  Nothing was produced relating to the Warren shooting.

**Public Records Act Request under Penal Code § 832.7**

96.   On September 23, 2019, the defense served a Public Records Act request on the Police Department under Penal Code section 832.7(b).  Under that statute, records relating to, inter alia, any incident involving the discharge of a firearm by a police officer at a person, and/or any incident in which the use of force by a police officer resulted in death or serious bodily injury, must be produced upon request.  Such materials "shall not be confidential and shall be made available for public inspection pursuant to the California Public Records Act." This provision took effect on January 1, 2019.

97.   The defense's letter asked specifically for any records relating to any discharge of a firearm at a person by either Officer McFarland or Officer Lack, and any records relating to any incident involving the use or force against a person by Officer McFarland or Officer Lack which resulted in death or great bodily injury.

98.    On October 11, 2019, the Police Department responded, in a letter signed by the Chief of Police.  The letter said: "Please be advised that the Pasadena Police Department has no records that are responsive to your request."  This statement was not true.

99.   In fact, at the time, the Department was in possession of at least 234 pages of reports and interviews from both Pasadena Police Department officers and Sheriff's Department officers, all dated between May 17 and July 10, 2019,

regarding Officer McFarland and the Warren shooting-- in which Officer McFarland discharged his firearm at Daniel Warren, resulting in Mr. Warren's death.

100.  The failure to produce the Warren shooting records under section 832.7, which expressly provides that such records are not confidential and must be produced, and the false statement that the Department had no such records, was a violation not only of state law but also of Mr. Toland's constitutional rights, because it was intended to, and did, prevent him from obtaining critical exculpatory evidence.

101.  The Department whistleblower disclosed those 234 pages to the Court on or about November 2, 2020.  They were finally disclosed by the Court to the prosecutor in March 2021, and the prosecutor dismissed the assault charges against Mr. Toland in April 2021.

**Discovery Motion and *Pitchess* Motion**

102.  In addition to the PRA request, the defense also filed a discovery motion, on September 24, 2020, and a *Pitchess* motion, on November 12, 2020.

103.  On October 8, 2020, the Court granted the defense's discovery motion, and ordered production by November 2, 2020.

104.  On November 5, 2020, the parties appeared and the Court informed them that it had received a flash drive sent directly to the Court from someone at the Police Department.  The Court stated that the flash drive contained a great deal of material that appeared relevant to the case.  Deputy City Attorney Javan Rad then appeared later that day and stated that the flash drive had been "inadvertently" produced, and that the City wanted it back.  The Court declined to return the flash drive, and held a series of in camera hearings with the City Attorney over the next three months regarding the materials.

105.  On November 12, 2020, the defense filed its *Pitchess* motion.  On November 30, 2020, the Superior Court granted the motion and ordered the City to produce Officer McFarland's file for the Court to review in camera, specifically

including all records of any investigation of Officer McFarland, whether pending or completed.

106.  As noted, at that time the City was in possession of at least 234 pages of investigation reports relating to Officer McFarland and the Warren shooting. However, the City *withheld all of it*—from the Court, from the District Attorney's Office, and from the defense.

107.  The City, by and through the City Attorney's Office, and Deputy City Attorney Javan Rad, produced a file to Court in response to the Court's order—but *withheld from that file all references to the Warren shooting*.  The City then provided the defense a one-page *Pitchess* disclosure, dated December 11, 2020, that contained literally *nothing* related to Officer McFarland.  The City's failure to produce the Warren shooting records to the Court pursuant to the Court's granting of the *Pitchess* motion was "misconduct relative to such a motion," *see* Order, ECF Doc. 30, at 7.

108.  The City also withheld all references to the Warren shooting from the materials it provided to the prosecution under section 1054.1, and, as previously noted, told the defense, in writing, that it was not in possession of any materials related to any use of force by Officer McFarland resulting in death.  Thus the City withheld *both* from the prosecutor, *and* from the Court, *and* from the defense, all references to the fact that Officer McFarland had shot and killed Daniel Warren a month before beating Mr. Toland.  If the City's plan had succeeded, then Mr. Toland, despite exhausting all legal pathways for obtaining discovery, would *never have learned* that Officer McFarland was the shooter in the Warren incident.

109.   However, someone in the Police Department did not believe that it was right to hide the Warren shooting information from the Court.  As noted, that individual delivered to the Superior Court judge a flash drive containing numerous documents which had never been disclosed to the prosecutor or to the defense.

110.  Those materials remained undisclosed until on or about March 9, 2021, while the City Attorney's Office requested repeated in camera hearings with the Court, and asserted multiple legal arguments to try to prevent production, arguments which the Court ultimately rejected.

111.  Finally, on March 9, 2021, the City produced the documents to the prosecutor, DDA Young.  DDA Young immediately recognized them as *Brady*, and produced them to the defense.  Then, on April 22, 2021, DDA Young dismissed all the assault charges against Mr. Toland, stating on the record that the District Attorney's Office—including herself and the two supervisors above her—had concluded that these materials made it impossible to pursue the charges.

112.  The City is answerable under *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978) because in suppressing the materials it acted with the direction, participation, and ratification of City policymakers; and also because it acted in accordance with its practice and custom of interfering in the criminal discovery process to withhold information about its police officers that it feared might lead to civil liability.  Other individuals who directly participated are sued as Doe defendants, and will be named in subsequent amendments, with permission of the Court, when their identities are ascertained through discovery.

**Summary of Contents of Withheld Materials**

113.  The withheld materials included, inter alia, the following two categories of *Brady* materials: (a) the 234 pages of reports and interviews regarding Officer McFarland and the Warren shooting; (b) emails and Microsoft Word documents reflecting at least *four* separate substantive drafts of the report, signed by Officer Torres, that purported to memorialize Officer McFarland's account of the Toland incident.  Those drafts showed that someone had made numerous substantive changes to the report—all of which changed the wording and narrative to make Officer McFarland's actions appear more justified.

114.  The City withheld both of the above sets of materials from the DA's office throughout the case.  The DA, the defense, and the Court only learned of them because of the whistleblower's flash drive sent to the judge.

115.  The changes made to the report were significant, and they are highly material.  Changes made to various drafts of a report are a standard and essential part of cross-examination.

116.  For example, Officer McFarland initially said he punched Mr. Toland in the face as a "distraction strike."  But someone changed the word "distraction" to "defensive," and someone added the allegation that Mr. Toland had grabbed Officer McFarland's arm, and then again (a second time) to add the further allegation that he had grabbed Officer McFarland's arm and wouldn't let go.

117.  There is no discussion of "distraction strikes" in the Department's policy manual.  Accordingly, while a "defensive" strike could in theory be justified based on the policy, a "distraction" strike would not.  So someone simply changed what Officer McFarland said.

118.  The Department deliberately chose not to record Officer McFarland's contemporaneous statements—while recording every other interview relating to the case.  The Department had seventeen (17) officers responding at various points during the night with body cameras recording their activities.  Every single interview and interaction with witnesses—Mr. Toland, his family, his neighbors, etc.—was recorded, *with the exception of the verbal account given by Officer McFarland*. And the various rounds of edits all passed through the desk of Sgt. Gligorivich, who was also, supposedly, responsible for conducting the Department's initial use-of-force review (a review that was, at the direction of the City Attorney, never conducted).

119.  The Department first ensure that there was no recording of Officer McFarland's statement, then repeatedly edited the report supposedly memorializing his statement in order to make his use of force appear justified.  It

then concealed that revision process from the DA, the Court, and the defense, and produced only the final draft, which had been substantially modified by someone.

120.  All of the intentionally withheld material was *Brady* evidence. All of it was wrongfully withheld from the DA, the Court, and the defense. And but for the whistleblower, none of it would ever have come to light.  The prosecution stated on the record, on April 22, 2021, that its decision not to continue the prosecution was based on its review of the withheld material.

121.  During the nearly two years between June 22, 2019, and April 22, 2021, Mr. Toland suffered every day the fear, anxiety, and uncertainty of being a defendant charged with serious felony offenses carrying potential years-long prison sentence. This caused him—as it would any reasonable person—great psychological and emotional harms.  During the same time, Mr. Toland had to expend a significant amount of money to fund his criminal defense.  All of this could and should have been avoided if the City had followed the Constitution.

122.  On information and belief,  the City Attorney's Office maintains a policy and practice of deliberately interfering in the criminal justice process to deprive defendants of exculpatory evidence by concealing officer misconduct, in order to attempt to avoid civil liability in civil rights lawsuits. The City Attorney's Office is thus directly liable under *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978).

123.  Mr. Toland suffered psychological, emotional, physical, reputational, and economic harms as a result of the wrongful conduct set forth herein, in an amount according to proof at trial and in excess of $1 million. Inter alia, he was beaten up and suffered physical injuries; he experienced emotional, psychological and reputational harms from being wrongly accused of a serious felony; and economic harms from being forced to expend resources to defend himself.

124.  The Court, which was privy to the in camera proceedings with the City Attorney from which Mr. Toland was excluded, made, inter alia, the following comments on the record:

125.  January 21, 2021: "I think it is inexcusable what happened in this case…. What I see now is that the City has interfered – interjected itself in the way the Pasadena Police Department should handle discovery. And that is troubling. That is very troubling."

126.  The Court, March 24, 2021:  "But I think it's fairly obvious that what happened in this case must never happen again.  And I think Ms. Young understands the responsibility that her office has to make sure it never happens again.  And I trust that the DA's office will deal with this at the highest levels of management in that office.  Because to allow a police agency to withhold evidence on the advice on counsel is a problem bigger than what we just see in this case."

127.  The Court, April 22, 2021: "I have never come across a case where a City Attorney or any other lawyer is getting involved in the discovery decisions made by the police agency where the police agency, based on that advice, doesn't disclose to the People relevant and material information about the case…. I really want to just caution the People that it really could impact the integrity of all prosecutions because we only fortuitously found this out…. But I wanted to be sure that what happened here never happens again."

128.  Mr. Toland agrees with the Court. And by this lawsuit, he hopes to help make sure that it never happens again.

## CLAIMS FOR RELIEF
## FIRST CLAIM FOR RELIEF
**Excessive Force, in Violation of the Fourth Amendment and 42 U.S.C. § 1983 (Against Defendants McFarland and Lack)**

129.  Mr. Toland realleges and incorporates by reference each foregoing and subsequent paragraph in this Complaint as though fully set forth herein.

130.  This claim for relief is brought pursuant to 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the United States Constitution.

131.  Defendants McFarland and Lack beat, choked, and Tased Mr. Toland severely and repeatedly, without justification or legal basis, and contrary to governing policy and clearly established law.

132.  As set forth above, Defendants did, *inter alia*, the following:

133.  Officer McFarland punched Mr. Toland in the face, at a time when Mr. Toland was not attacking or threatening anyone (as set forth herein, Mr. Toland never attacked or threated anyone).

134.  Officer McFarland threw Mr. Toland to the ground at a time when Mr. Toland was not attacking or threatening anyone (as set forth herein, Mr. Toland never attacked or threated anyone).

135.  Officer McFarland Tased Mr. Toland at least twice at a time when Mr. Toland was not attacking or threatening anyone (as set forth herein, Mr. Toland never attacked or threatened anyone).

136.  Officer McFarland punched Mr. Toland between 10 and 20 times in the head at a time when Mr. Toland was not attacking or threatening anyone (as set forth herein, Mr. Toland never attacked or threated anyone).

137.  Officer McFarland put his arm around Mr. Toland's neck from behind, and attempted to choke Mr. Toland into unconsciousness by cutting off blood flow to Mr. Toland's brain, at a time when Mr. Toland was seated on the ground, and not attacking, or threatening anyone (as set forth herein, Mr. Toland never attacked or threated anyone).

138.  Officer Lack put her arm around Mr. Toland's neck from behind, and attempted to choke Mr. Toland into unconsciousness by cutting off blood flow to Mr. Toland's brain, at a time when Mr. Toland was seated on the ground, and not attacking, or threatening anyone (as set forth herein, Mr. Toland never attacked or threated anyone).

139.    The reason she and Officer McFarland her arm around Mr. Toland's neck from behind, and attempted to choke Mr. Toland into unconsciousness by cutting off blood flow to Mr. Toland's brain, at a time when Mr. Toland was seated on the ground, and not attacking, or threatening anyone, was that Mr. Toland had remained seated on the ground rather than lie down immediately on his stomach.

140.    Employing a chokehold, "carotid control hold," or any technique that involves making contact with a person's neck, whether grabbing, squeezing, pressuring, or "arm-barring," with the purpose of rendering the person unconscious by cutting off blood flow to the brain, is, and was on the date of the incident, a clearly established violation of the Fourth Amendment, when the person is sitting on the ground and not attacking or threatening anyone.

141.  That constitutional rule is clearly established.  Defendants McFarland and Lack were on actual and constructive notice of it, and deliberately violated it, with the specific intent to harm Mr. Toland, viz., to cut off blood flow to his brain and render him unconscious.  Their decision to do so knowing that doing so violated clearly established constitutional law on the use of force is reprehensible and malicious and warrants imposition of punitive damages.

142.    Mr. Toland was damaged by and as a direct and proximate result of Defendants' unlawful conduct, as set forth herein.

143.    There is and was no ambiguity about the law in this area, and thus no possible legally colorable qualified immunity argument. In the United States of America, it is unconstitutional to apply a chokehold to a man sitting in his driveway not touching, attacking, or threatening anyone, because he fails to comply with a verbal command to lie on his stomach.[4]

---

[4] *See, e.g.*, *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1093 (9th Cir. 2013) ("The [Fourth Amendment] right to be free from the application of non-trivial force for engaging in mere passive resistance was clearly established prior to 2008.") *Tuuamalemalo v. Greene*, 946 F.3d 471, 477 (9th Cir. 2019) ("There is a robust

## SECOND CLAIM FOR RELIEF

**(Unreasonable Seizure of Person in Violation of the Fourth Amendment and 42 U.S.C. § 1983)**

**(Against Officers McFarland and Lack)**

144.   Mr. Toland re-alleges and incorporates by reference all preceding and succeeding paragraphs as though fully set forth herein.

145.   Defendants, acting under color of state law, using their official position, status, and authority as Pasadena Police officers, made knowingly false statements to other officers, as set forth herein, claiming that Mr. Toland had "attacked" Officer McFarland, to procure Mr. Toland's arrest without probable cause.

146.   By procuring Mr. Toland's arrest based on false accusations, and knowing that the accusations were false, Defendants violated Mr. Toland's Fourth Amendment right to be free from unreasonable seizure of his person.

147.   Officer Lack claimed in her report the night of the incident that Mr. Toland "violently attacked" Officer McFarland.  She knew that that statement was not true, and that in fact she never saw any such thing.

148.   Officer McFarland claimed, in his statements to Officer Torres, that Mr. Toland jumped out the car, got behind him, put his arm around his neck, and choked him for five seconds until he felt himself blacking out.  He knew that that statement was not true.

149.  It is a violation of the Fourth Amendment for a police officer to deliberately make a false statement accusing a person of a crime, including by claiming to have witnessed an event that the police officer in fact did not witness.

150.  As a direct and proximate result of Defendants' actions, Mr. Toland was wrongfully seized, arrested, and detained, and suffered damages as alleged herein.

151.  It is clearly established that police officers may not lie or make false

consensus among the circuits that the use of a chokehold on a non-resisting person violates the Fourth Amendment.").

accusations in their reports and testimony.  That constitutional rule is clearly established.  Defendants McFarland and Lack were on actual and constructive notice of it, and deliberately violated it, with the specific intent to harm Mr. Toland, viz., to procure his arrest and prosecution for "violently assaulting" Officer McFarland—something that Officer Lack admitted under oath did not occur.  Their decision to do so knowing that doing so violated clearly established constitutional law on the use of force is reprehensible and malicious and warrants imposition of punitive damages.

## **THIRD CLAIM FOR RELIEF**

**(Unreasonable Seizure of Person in Violation of the Fourth Amendment and 42 U.S.C. § 1983)**

**(Against Defendant Officer McFarland)**

152.  Mr. Toland realleges and incorporates by reference each foregoing and subsequent paragraph in this Complaint as though fully set forth herein.

153.  Officer McFarland seized Mr. Toland without reasonable suspicion or probable cause.

154.  Officer McFarland's traffic stop was a detention requiring an adequate legal justification under the Fourth Amendment.

155.  Officer McFarland claimed that he pulled over Mr. Toland because Mr. Toland's brake lights were malfunctioning.

156.  That claim was false.  The video evidence proves that Mr. Toland's brake lights were functioning normally, and that Officer McFarland saw them functioning normally.

157.  Officer McFarland's post-hoc claim that he was able to see a twentieth-of-a-second "delay" in the illumination of the right brake light compared to the left and center brake lights was false.

158.  Officer McFarland's post-hoc claim that he saw a twentieth-of-a-second "delay" in the illumination of the right brake light compared to the left and center brake lights could not have created a legal justification for the stop in any event.

159.  Officer McFarland's detention of Mr. Toland was unconstitutional, and harmed by Officer McFarland's unconstitutional conduct, because but for the unconstitutional initial detention, Mr. Toland would not have been beaten, Tased, and choked by Officers McFarland and Lack, and would not have been wrongfully arrested and charged.

## FOURTH CLAIM FOR RELIEF

**(Deliberate Fabrication of Evidence in Violation of the Fourteenth Amendment and 42 U.S.C. § 1983)**
**(Against Defendants Officer McFarland and Officer Lack)**

160.  Toland realleges and incorporates by reference each foregoing and subsequent paragraph in this Complaint as though fully set forth herein.

161.  Officer McFarland acting under color of law, deliberately deprived Mr. Toland of his rights under the Constitution when he fabricated false allegations against Mr. Toland that were used to criminally charge and prosecute Mr. Toland. Officer McFarland falsely claimed that Mr. Toland attacked him, choked him, and pinned him to the ground.  These statements were deliberate fabrications.

162.  Officer McFarland presented false evidence to the prosecutor and that false evidence led to Mr. Toland being charged.  Therefore, the filing of the charges does not protect Officer McFarland from liability for his false statements. *See, e.g., Caldwell v. City & Cty. of San Francisco*, 889 F.3d 1105, 1115 (9th Cir. 2018) (where an officer presents false evidence to the prosecutor, the filing of charges does not provide any immunity to the officer, and "the analysis reverts back to a normal causation question"); Ninth Circuit Jury Instruction 9.2, "Deliberate Fabrication" Comment.

163.  Officer Lack, acting under color of law, deliberately deprived Mr. Toland of his rights under the Constitution when she fabricated false allegations against

Mr. Toland that were used to criminally charge and prosecute Mr. Toland.  Officer Lack falsely claimed in her written report that Mr. Toland violently attacked Officer McFarland.  That statement was false.  Officer Lack knew it was false. Officer Lack admitted in her sworn testimony at the preliminary hearing that that statement was false, and that in fact Mr. Toland never attacked Officer McFarland.

164.  Officer Lack presented false evidence to the prosecutor, and that false evidence led to Mr. Toland being charged.  Therefore, the filing of the charges does not protect Officer Lack from liability for her false statements.  *See*, *e.g.*, *Caldwell v. City & Cty. of San Francisco*, 889 F.3d 1105, 1115 (9th Cir. 2018) (where an officer presents false evidence to the prosecutor, the filing of charges does not provide any immunity to the officer, and "the analysis reverts back to a normal causation question"); Ninth Circuit Jury Instruction 9.2, "Deliberate Fabrication" Comment.

165.  It is a clearly established constitutional rule that police officers may not lie or make false accusations in their reports and testimony.  That constitutional rule is clearly established.  Defendants McFarland and Lack were on actual and constructive notice of it, and deliberately violated it, with the specific intent to harm Mr. Toland, viz., to procure his arrest and prosecution for "violently assaulting" Officer McFarland—something that Officer Lack admitted under oath did not occur.  Their decision to do so knowing that doing so violated clearly established constitutional law on the use of force is reprehensible and malicious and warrants imposition of punitive damages.

166.  Mr. Toland was harmed by Officer McFarland's and Officer Lack's deliberate fabrication of evidence.  He suffered psychological, emotional, and reputational harms in an amount subject to proof at trial, through being forced to spend close to two years with a serious felony charge hanging over him, knowing that he was innocent; he suffered economic harms, including legal fees, in an amount subject to proof at trial.

# FIFTH CLAIM FOR RELIEF

## (Deliberate or Reckless Suppression of Evidence in Violation of the Fourteenth Amendment and 42 U.S.C. § 1983)

## (Against Defendants City and Does 1-10)

167.  Toland realleges and incorporates by reference each foregoing and subsequent paragraph in this Complaint as though fully set forth herein.

168.  Defendants deprived Mr. Toland of his constitutional rights by deliberately and recklessly suppressing exculpatory evidence.  Defendants acted deliberately, and pursuant to a policy of the City, to intervene in the criminal discovery process to prevent the Police Department from turning over material favorable to Mr. Toland to the District Attorney's Office, so that that evidence would never see the light of day, would be suppressed from and unknown to the prosecutor, the defense, and the court in Mr. Toland's criminal case.

169.  Defendants did so with the deliberate and express intention of impairing and undermining Mr. Toland's right and ability to file a civil rights lawsuits.  The City acted in accordance with its policy and practice, and with the knowledge, acquiescence, and ratification of the relevant policymaker, so as to subject it to direct civil liability under *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978).

170.  Defendants deliberately and recklessly suppressed from, the prosecution, the defense, and the Court, the evidence that Officer McFarland had shot and killed Daniel Warren on May 17, 2019, only one month before he beat Mr. Toland. In the Warren shooting Officer McFarland escalated an encounter unnecessarily and aggressively, used deadly force without necessity, and then made false statements about his actions.  All of that information was in the 234 pages of reports in Defendants' possession. The evidence was *Brady* evidence because it was really likely to be favorable to the defense and affect the outcome of the proceedings, as it in fact did affect the outcome when finally obtained by the Court, the

prosecution, and the defense.

171.  Defendants were deliberately indifferent to Mr. Toland's constitutional rights to due process and a fair trial.  Defendants did not care if Mr. Toland were wrongfully convicted, so long as they could save the City money by avoiding a civil rights lawsuit for excessive force.

172.  Defendants actively hoped and intended that Mr. Toland would be convicted while never knowing about the suppressed impeachment materials.

173.  It is clearly established that government officials, including attorneys, may not suppress exculpatory evidence.  That constitutional rule has been clearly established for more than forty years.  Defendants were on actual and constructive notice of it, and deliberately violated it, with the specific intent to harm Mr. Toland, viz., to procure his prosecution and conviction for "violently assaulting" Officer McFarland, by preventing him from obtaining evidence that could have—and in fact ultimately *did*—result in the charges being dismissed.

174.  Defendants' deliberate decision to attempt to procure Mr. Toland's conviction by burying exculpatory evidence and preventing the defense, the prosecution, or the Court from seeing it is reprehensible, malicious, outrageous, and contrary to the ethical principles that govern the profession of law, and warrants imposition of punitive damages.

## SIXTH CLAIM FOR RELIEF

**(Conspiracy to Suppress Evidence in Violation of the Fourteenth Amendment and 42 U.S.C. § 1983)**
**(Against Defendants City and Does 1-10)**

175.  Toland realleges and incorporates by reference each foregoing and subsequent paragraph in this Complaint as though fully set forth herein.

176.  Defendants conspired to deprive Mr. Toland of his constitutional rights by deliberately and recklessly suppressing exculpatory evidence.  Defendants conspired with City officials and attorneys in the City Attorney's Office, and followed a deliberate City policy to intervene in the criminal discovery process to

prevent the Police Department from turning over material favorable to Mr. Toland to the District Attorney's Office, so that that evidence would never see the light of day, would be suppressed from and unknown to the prosecutor, the defense, and the court in Mr. Toland's criminal case.

177.  Defendants did so with the deliberate and express intention of impairing and undermining Mr. Toland's right and ability to file a civil rights lawsuits. The City acted in accordance with its policy and practice, and with the knowledge, acquiescence, and ratification of the relevant policymaker, so as to subject it to direct civil liability under *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978).

178.  Defendants deliberately and recklessly suppressed from the prosecution, the defense, and the Court—the evidence that Officer McFarland had shot and killed Daniel Warren on May 17, 2019, four weeks before he beat Mr. Toland.

179.  Defendants were deliberately indifferent to Mr. Toland's constitutional rights to due process and a fair trial.  Defendants did not care if Mr. Toland were wrongfully convicted, so long as they could save the City money by avoiding a civil rights lawsuit for excessive force.

180.  Defendants actively hoped and intended that Mr. Toland would be convicted while never knowing about the suppressed impeachment materials.

181.  Defendants' deliberate decision to attempt to procure Mr. Toland's conviction by burying exculpatory evidence and preventing the defense, the prosecution, or the Court from seeing it is reprehensible, malicious, outrageous, and contrary to the ethical principles that govern the profession of law, and warrants imposition of punitive damages.

## **PRAYER FOR RELIEF**

Mr. Toland prays for relief as follows:

1.  Compensatory, general and special damages against all Defendants in an amount to be proven at trial.

2.  Costs, expenses and attorneys' fees pursuant to 42 U.S.C. section 1988 and as otherwise authorized by law.

3.  Punitive damages against Defendants in an amount appropriate to punish them and to deter others from engaging in similar misconduct.

4.  Such other relief as the Court may deem proper.


DATED:  October 4, 2021                    Respectfully submitted,

                                           WERKSMAN JACKSON & QUINN, LLP

                                           *[signature]*

                                           CALEB E. MASON
                                           JACQUELINE M. SPARAGNA
                                           Attorneys for Plaintiff
                                           Jeffrey Toland


## **DEMAND FOR JURY TRIAL**

Mr. Toland demands a jury trial.

DATED:  October 4, 2021                         Respectfully submitted,


                                           WERKSMAN JACKSON & QUINN, LLP

                                           *[signature]*

                                           CALEB E. MASON
                                           JACQUELINE M. SPARAGNA
                                           Attorneys for Plaintiff
                                           Jeffrey Toland